UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RAYMOND A. HOFF and NANCY B. HOFF,
Plaintiffs,

v.

AVCO CORPORATION, et al.,
Defendants.

C.A. No.: 3:24-cv-00206-SFR

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT RTX CORPORATION'S MOTION TO PRECLUDE TESTIMONY OF PLAINTIFFS' EXPERT MICHAEL ELLENBECKER, Sc.D., CIH**

Defendant RTX Corporation, improperly named as "Raytheon Technologies Corporation, f/k/a United Technologies Corporation, Individually and as successor-in-interest to Pratt & Whitney" (hereinafter "RTX" or "Pratt & Whitney"), hereby submits this memorandum of law in support of its Motion to Preclude Plaintiffs' expert, Michael Ellenbecker, Sc.D., CIH ("Dr. Ellenbecker"), from testifying at trial that Plaintiff, Raymond Hoff, was exposed to asbestos from aviation engines manufactured by Pratt & Whitney, or that any such exposure increased his risk of developing an asbestos-related disease.[1] Dr. Ellenbecker's opinions, and the methodology upon which those opinions are founded, lack the reliability required of an expert, are speculative, and are based on unsupported assumptions. Moreover, any probative value Dr. Ellenbecker's "expert" opinions may have are substantially outweighed by the dangers of confusing and misleading the jury and are therefore prejudicial to RTX. The opinions that Plaintiffs seek to have Dr. Ellenbecker provide at trial do not meet the stringent requirements imposed by Rules 403 and 702 of the Federal

[1] RTX disputes Plaintiffs' contention that Mr. Hoff suffers from mesothelioma. RTX contends that Mr. Hoff suffers from lung cancer, attributable to cigarette smoking.

Rules of Evidence for the admissibility of expert testimony. As such, Dr. Ellenbecker must be precluded from offering these opinions at trial.

## BACKGROUND

Plaintiffs allege that Mr. Hoff was exposed to asbestos while serving in the United States Air Force from 1969 to 1993, and during his employment at Dover Air Force Base in Delaware from 1996 to 2018. Mr. Hoff was deposed over the course of three days, during which he testified generally to work on certain models of Pratt & Whitney jet engines while he was in the Air Force. Plaintiffs designated various experts in this case including Dr. Ellenbecker. They produced an expert report from Dr. Ellenbecker dated May 16, 2025. That report sets forth Dr. Ellenbecker's opinions in this case regarding Mr. Hoff's work with and around Pratt & Whitney engines. (*See* Ellenbecker Expert Report, attached hereto as **Ex. 1**). Dr. Ellenbecker intends to offer the opinion that, during his time in the United States Air Force, Mr. Hoff was exposed to asbestos-containing thermal insulation on jet engines, as well as asbestos released from gaskets and other alleged components of aviation engines manufactured by Pratt & Whitney in sufficient quantities to have increased his risk of developing mesothelioma. (*See* Relevant Excerpts from Dr. Ellenbecker's Deposition, attached hereto as **Ex. 2**).

Dr. Ellenbecker's opinions—and the methodology upon which those opinions are founded—lack the foundation and reliability required of an expert, and are not based on sufficient facts and data, and are therefore speculative. Furthermore, Dr. Ellenbecker ignored relevant asbestos air sampling results documented in a scientific work study of aviation engine maintenance and published in a peer-reviewed scientific journal that run contrary to his opinions and, instead, compared Mr. Hoff's unknown and unquantifiable exposure levels to dust levels taken in studies outside of the aviation context. Dr. Ellenbecker relies on studies that are not sufficiently similar

and do not "fit" the facts of the case, even though he admits that the potential fiber release generated in this case is not likely to be consistent with the literature he cites as the basis for his opinion but, rather, would be lower than the studies. Accordingly, any limited probative value of Dr. Ellenbecker's "expert" opinions is substantially outweighed by the dangers of confusing and misleading the jury and his opinions should be precluded.

For these reasons, and as further discussed below, Dr. Ellenbecker's opinions regarding Mr. Hoff's alleged exposure to asbestos fibers released from work performed on Pratt & Whitney engines and any opinions of an increased risk of developing mesothelioma from his work with or around aviation engines in the United States Air Force must be precluded.

## STANDARD OF REVIEW

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony. Fed. R. Evid. 702; *see Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). The trial judge determines at the outset whether the proffered expert testimony is admissible under Rule 702. *See generally Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Plaintiffs bear the burden of establishing their experts' testimony is "competent, relevant, and reliable." *See Wine v. Black*, No. 3:18-cv-704, 2024 WL 2809200, at *3 (D. Conn. May 17, 2024); *Izzarelli v. R.J. Reynolds Tobacco Co.*, 806 F. Supp. 2d 516, 531 (D. Conn. 2011), *aff'd in part, vacated in part on other grounds*, 701 F. App'x 26 (2d Cir. 2017). It is the duty of the trial judge to act as a "gatekeeper" to ensure that "the fact-finding process does not become distorted by what is popularly called junk science." *Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 24 (D. Mass. 1995) ("This role is especially sensitive in cases where the plaintiff claims that exposure to a toxic substance caused his injury, because a jury may blindly accept an expert's opinion that conforms with their

underlying fears of toxic substances without carefully understanding or examining the basis for that opinion.”).

In determining whether Plaintiffs have met their burden of establishing the admissibility of expert testimony, the trial judge must determine whether the experts’ testimony has “a reliable basis in the knowledge and experience of [the relevant] discipline.” *See Daubert*, 509 U.S. at 592. The rationale behind the *Daubert* standard is to ensure that an expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *See Kumho*, 526 U.S. at 152.

Once an expert has been shown to be qualified on the specific subject matter, the trial judge must then determine whether the expert’s testimony “reflects ‘scientific knowledge,’ whether their findings are ‘derived by the scientific method,’ and whether their work product amounts to ‘good science’.” *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (hereinafter “*Daubert II*”). Similarly, Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert’s scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The expert must employ a scientific method to analyze the facts or data at issue in the case.

Moreover, the scientific methodology utilized by the expert must be found to be reliable. In *Daubert*, the United States Supreme Court set forth the following non-exclusive list of factors to assess the reliability of an expert’s proffered testimony:

> (1) whether the theory or technique on which the expert relies can be (and has been) tested, that is, whether the expert’s theory can be challenged in some objective sense, or

whether it is instead simply a subjective,[2] conclusory approach that cannot reasonably be assessed for reliability;

(2) whether the theory or technique has been subjected to peer review and publication;

(3) the known or potential rate of error of the technique or theory when applied;

(4) the existence and maintenance of standards controlling the technique's operation; and

(5) whether the theory or method has achieved general or widespread acceptance in the relevant scientific community.

*Daubert*, 509 U.S. at 593-94. The test of reliability is a flexible one such that the factors set forth in *Daubert* do not constitute a definitive checklist or test. Whether the *Daubert* factors are apposite to the reliability inquiry in a particular case depends on "the nature of the issue, the expert's particular expertise, and the subject of his testimony." *See Kumho*, 526 U.S. at 150. In other words, "the gatekeeping inquiry must be 'tied to the facts' of a particular case." *Id.*; *see also Daubert*, 509 U.S. at 590-92. The particular facts of a case may, therefore, call for the consideration of other reliability factors. These include, whether the expert has "developed [his] opinions expressly for purposes of testifying," whether the expert "has unjustifiably extrapolated from an accepted premise to an unfounded conclusion," or whether the expert "has adequately accounted for obvious alternative explanations." *See Daubert II*, 43 F.3d at 1317; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994); *see also* Fed. R. Evid. 702 advisory committee's notes.

"The trial court must not only determine whether the testimony is reliable; it must also determine whether [the] expert's testimony is 'relevant to the task at hand,' in other words, whether the expert's reasoning or methodology can be properly applied to the facts before the court."

[2] The notion of whether the expert's opinion is simply a subjective one is significant because the "trial court's gatekeeping function requires more than simply 'taking the expert's word for it'." *See* Fed. R. Evid. 702 advisory committee's note (citing *Daubert II*, 43 F.3d at 1319). "The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." *See* Fed. R. Evid. 702 advisory committee's note (citing *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir. 1994)).

*Travelers Prop. & Cas. Corp. v. Gen. Elec. Co.*, 150 F. Supp. 2d 360, 364 (D. Conn. 2001). Therefore, the testimony must be relevant in that it "fits" the facts of the case. *Id.* In explaining the "fit" requirement, the Supreme Court noted that scientific expert testimony carries special dangers to the fact-finding process because it "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert II*, 43 F.3d at 1321 n.17. As such, it is incumbent upon the trial judge to exclude proffered expert testimony under Rules 702 and 403 unless "convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Id.*; *see Franklin v. Consol. Edison Co. of New York, Inc.*, 37 F. App'x 12, 14 (2d Cir. 2002) (affirming district court's conclusion that expert's opinion did not "fit" where he was not an expert on the particular disease, no articles established a link between alleged cause and disease, the expert's methodology was suspect, the opinion was made solely for litigation, and there was no scientific basis for the opinion).

## **ARGUMENT**

### I. **DR. ELLENBECKER'S OPINIONS ARE BASED ENTIRELY ON SPECULATIVE ASSUMPTIONS AND MUST BE EXCLUDED.**

An expert's opinion that is speculative, in other words not "based on sufficient facts or data," must be excluded. *See* Fed. R. Evid. 702. "Admission of expert testimony based on speculative assumptions is an abuse of discretion." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996) (vacating judgment and finding district court abused its discretion in allowing speculative expert testimony). For example, in *Ace Am. Ins. Co. v. Eaton Elec., Inc.*, No. 3:11-cv-1741, 2015 WL 233032 (D. Conn. Jan. 16, 2015), a product liability action arising out of a fire, the plaintiff's expert opined that the fire had been caused by a short-circuit to a circuit breaker due to moisture ingress. This court precluded the expert's testimony reasoning that such opinion was

entirely speculative. *Id.* at *13-14 (noting the absence of evidence supporting the opinion as well as evidence in the record to the contrary).[3]

In his report, Dr. Ellenbecker lists a number of aviation related parts that he calls "categories of equipment" including thermal insulation, clamps, gaskets, fire sleeves, hose assemblies, wiring and cable to support his opinion that "Mr. Hoff had repeated, elevated exposures to airborne asbestos" while in the U.S. Air Force. (**Ex. 1**, Ellenbecker Report p. 22). Many of the items listed in Ellenbecker's "categories of equipment" were not provided by Pratt & Whitney and not all of the listed parts or components that were supplied by Pratt & Whitney contained asbestos. (*See* Affidavit of John Sumner, attached hereto as **Ex. 3** at ¶¶ 8-12).[4] Yet, in forming his opinions, Dr. Ellenbecker does not distinguish between parts that were provided by Pratt & Whitney and those that were not. He makes no effort to evaluate or quantify the potential exposure Mr. Hoff may have experienced from work with Pratt & Whitney component parts as opposed to parts/products made and supplied by others. Instead, he makes broad, sweeping assumptions about exposures to asbestos generally while Mr. Hoff was in the United States Air Force, but provides no assessment of the frequency or duration of Mr. Hoff's contact with any allegedly asbestos-containing products that would have been specifically supplied by Pratt & Whitney with engines at issue in the case. However, in order to meet the substantial factor test in

---

[3] For further Second Circuit cases where an expert was precluded from testifying because of a lack of foundation for the opinion *see Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 91-92 (2d Cir. 2000) (upholding lower court's exclusion of expert testimony where expert never saw product, never spoke with individuals involved in accident, was unaware of the physical properties of the product, did not know precisely what happened, and had never attempted to reconstruct accident and test his theory); *Hunt v. CNH Am. LLC*, 511 F. App'x 43, 47 (2d Cir. 2013) (affirming order excluding expert testimony where expert relied on assumptions not based on evidence); *Russo v. Keough's Turn of the River Hardware, LLC*, 529 F. App'x 50, 52 (2d Cir. 2013) (affirming exclusion of expert's opinion on causation where expert did not review the specifications for the product and did not test the product); *see also Kuzmech v. Werner Ladder Co.*, No. 3:10-cv-266, 2012 WL 6093898, at *8 (D. Conn. Dec. 7, 2012).

[4] Mr. Sumner's affidavit was prepared in connection with RTX's Motion for Summary Judgment and contains references to additional exhibits attached to the affidavit that relate to issues raised in RTX's Motion for Summary Judgment but do not relate to issues raised in the instant Motion to Preclude. For this reason, only Mr. Sumner's affidavit is being attached as Ex. 3 to this Motion and not the exhibits referenced therein.

Connecticut, an expert such as Dr. Ellenbecker must take into account the timing and amount of Mr. Hoff's exposures to asbestos from each Defendant's products. *See Bagley v. Adel Wiggins Grp.*, 171 A.3d 432, 444 (Conn. 2017).

Dr. Ellenbecker admitted that he did not know which parts or components that were attached to the engine were supplied by Pratt & Whitney and which ones were supplied and installed by other entities, including as part of the "QEC" kit (Quick Engine Change—a set of parts installed on the engine by the airframer to mate the engine with the airframe to make the aircraft operable). (**Ex. 2**, Ellenbecker Dep. 116:12-22). In fact, none of the engines at issue in this case were supplied by Pratt & Whitney with any fire sleeves, which is one the "categories of equipment" or parts considered by Ellenbecker in offering his opinions. (*See* Relevant Excerpts from John Sumner's Deposition, attached hereto as **Ex. 4** at 109:5-10). Moreover, some of the gaskets and clamps on the engines were not supplied by Pratt & Whitney but were part of the QEC, which is installed after the new engine is sold and shipped from Pratt & Whitney. (**Ex. 3**, Sumner Aff. ¶¶ 8, 10-11). Despite the various sources of components attached to the engines, in forming his opinion regarding exposure Dr. Ellenbecker does not determine the number of asbestos-containing versus non-asbestos containing gaskets and clamps Mr. Hoff may have encountered and which of them may have been supplied by Pratt & Whitney.

Dr. Ellenbecker also admitted he did not know whether the heat shields/insulation Mr. Hoff described were an item that came with the airframe as opposed to the engine. (**Ex. 2**, Ellenbecker Dep. 128:19-130:8). Instead, Dr. Ellenbecker relies on the testimony of another one of Plaintiffs' experts, Theodore Cecchini, regarding who supplied any insulation material Mr. Hoff may have described in connection with work on a Pratt & Whitney engine. Yet, during his deposition, while Mr. Cecchini addressed three different kinds of insulation material Mr. Hoff described, he

conceded he had no evidence or knowledge that any such insulation material was supplied by Pratt & Whitney. (*See* Relevant Excerpts from Mr. Cecchini's Deposition, attached hereto as **Ex. 5**). In fact, with respect to the first type of insulation material Mr. Hoff described (the insulation in the engine bay of the airframe), Mr. Cecchini agreed that this material was provided by the airframe manufacturer. (**Ex. 5**, Cecchini Dep. 214:13-215:8). For the insulation around the afterburner, Mr. Cecchini agreed that it was in the IPB (Illustrated Parts Breakdown—or parts catalog) for the airframe manufacturer, and that he did not know who supplied it. (**Ex. 5**, Cecchini Dep. 207:5-208:18). The third type of insulation material Mr. Hoff described was a so-called "vapor barrier." Although Mr. Cecchini was not sure what part Mr. Hoff was describing, he admits that whatever it is, he does not know who supplied it. (**Ex. 5**, Cecchini Dep. 209:18-211:5). Therefore, because Dr. Ellenbecker relies on Mr. Cecchini's testimony regarding the supplier of insulation material Mr. Hoff associated with aviation engines, and since Mr. Cecchini cannot say that any of that insulation was supplied by Pratt & Whitney (it was not), Dr. Ellenbecker's opinion that Mr. Hoff was exposed to asbestos insulation for which RTX is liable while working on or around Pratt & Whitney engines is based on mere speculative assumptions and must be precluded.

Dr. Ellenbecker cites to a corporate deposition of General Electric and General Electric "confidential company documents" that he reviewed in a "previous litigation" to support his general conclusion that "it is well known that asbestos was widely used in aerospace equipment." (**Ex. 1**, Ellenbecker Report p. 26-27). Statements made by General Electric about its unrelated products are inadmissible hearsay and cannot be used to support Dr. Ellenbecker's claim regarding the asbestos content of any components in the Pratt & Whitney engines at issue. In fact, not all of the gaskets and clamps that were in or on the Pratt & Whitney engines at issue contained asbestos, and many did not. (**Ex. 4**, Sumner Dep. 190:23-191:16). Mr. Hoff conceded that he did not know

the material composition of the gaskets he removed from Pratt & Whitney engines. (*See* Relevant Excerpts from Mr. Hoff's Deposition on 4/25/23, attached hereto as **Ex. 6** at 187:19-188:1). Mr. Hoff's testimony regarding the asbestos content of the clamps comes from what someone told him and is, therefore, based on inadmissible hearsay and speculation. (**Ex. 6**, 4/25/23 Hoff Dep. 67:22-24). And, even assuming the insulation described by Mr. Hoff were Pratt & Whitney parts, which Pratt & Whitney does not concede for the reasons addressed above, there is no evidence in this record that the insulation associated with those heat shields contained asbestos. Dr. Ellenbecker admitted that he does not know if the insulation material associated with the heat shields was asbestos. (**Ex. 2**, Ellenbecker Dep. 117:16-118:7). Pratt & Whitney's corporate representative confirmed that none of the insulating heatshields supplied by Pratt & Whitney for the engines at issue here contained asbestos. (**Ex. 4**, Sumner Dep. 171:10-172:7). Dr. Ellenbecker conceded that if there is no asbestos within any heat shields used on the Pratt & Whitney engines, Mr. Hoff would not have had any exposure to asbestos from those heat shields. (**Ex. 2**, Ellenbecker Dep. 118:8-14). Yet, Dr. Ellenbecker concludes, despite all evidence to the contrary, that the insulation material Mr. Hoff claims he encountered increased his risk of developing an asbestos-related disease.

Connecticut courts have excluded expert opinions as unreliable where the underlying factual assumptions are unsupported. *See, e.g.*, *Old Gate Partners, LLC v. Paddock Enters., LLC*, No. 3:18-cv-01657, 2024 WL 3520168, at *12 (D. Conn. May 30, 2024) ("Such speculation . . . is not appropriate expert testimony and would not be helpful to a factfinder."); *Vallali v. Yale Univ.*, No. 3:16-cv-1345, 2022 WL 969753, at *1 (D. Conn. Mar. 30, 2022) ("The admission of expert testimony based on speculative assumptions is an abuse of discretion.") (quoting *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008); *Ace Am. Ins. Co.*, 2015

WL 233032, at *13-14. The facts upon which an expert opinion is based must be established by laying an adequate foundation. *See K.E. v. GlaxoSmithKline LLC*, No. 3:14-cv-1294, 2017 WL 440242, at *8 (D. Conn. Feb. 1, 2017); MacDermid Printing Solutions, Inc. v. Cortron Corp., No: 3:08-cv-1649, 2014 WL 2616836, at *1 (D. Conn. June 12, 2014) (noting party proffering expert testimony "will, of course, have to lay a foundation for the testimony".). Dr. Ellenbecker's opinions regarding asbestos-containing components that Mr. Hoff allegedly encountered that are attributable to Pratt & Whitney are based on nothing more than conjecture and do not rise beyond the level of mere speculation. Because Dr. Ellenbecker lacks sufficient facts or data for his opinion that Mr. Hoff was exposed to asbestos attributable to Pratt & Whitney, his opinion must be excluded.

## II. DR. ELLENBECKER'S OPINIONS ARE NOT RELEVANT AS THEY DO NOT "FIT" THE FACTS OF THE CASE.

### A. The Studies That Serve as the Foundation for Dr. Ellenbecker's Opinions Are Unrelated, and Not Substantially Similar, to Aviation Engines.

"An expert's opinion may be unreliable if he fails to account for contrary scientific literature and instead 'selectively chooses his support from the scientific landscape'." *Yates v. Ford Motor Company*, 113 F. Supp. 3d 841, 858 (E.D.N.C. 2015) (quoting *Eghnayem v. Boston Sci. Corp.*, 57 F. Supp. 3d 658, 676 (S.D. W.Va. 2014)). "[I]f the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable." *Id.* at 858; *accord Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 886 (10th Cir. 2005) (affirming exclusion of expert testimony that failed to account for epidemiological evidence); *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 26 F. Supp. 3d. 449, 460-61 (E.D. Pa. 2014) ("The Court finds that the expert report prepared by Dr. Bérard does selectively discuss studies most supportive of her conclusions . . . and fails to account adequately for contrary evidence"); *Pooshs v. Phillip Morris USA, Inc.*, 287 F.R.D.

543, 546 (N.D. Cal. 2012) ("A methodology may not be reliable if an expert fails to address and exclude alternative explanations for the data on which he bases his findings or rejects studies reporting contrary empirical findings."); *see also Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994) (whether the expert "has adequately accounted for obvious alternative explanations" is another factor to consider in determining reliability).

Here, Dr. Ellenbecker selectively chose to rely on studies that are not sufficiently similar and do not "fit" the facts of this case. Dr. Ellenbecker agrees that Mr. Hoff described the heatshields used on Pratt & Whitney engines as "metal clad" and said they looked like aluminum foil, stainless steel with insulation between the inner and outer surfaces-sandwiched between the outer layer of metal and a layer of insulation. (**Ex. 2**, Ellenbecker Dep. 117:2-15). However, Dr. Ellenbecker relies on studies regarding the potential fiber release from asbestos-containing pipecovering or block insulation to support his opinion regarding the potential fiber release from heat shields that contain asbestos insulation encapsulated within metal. (**Ex. 2**, Ellenbecker Dep. 123:15-124:12). Yet, Dr. Ellenbecker agrees "it is not likely" that an insulation material encased in stainless steel could generate a fiber release consistent with the literature he cites as the basis for his opinion. (**Ex. 2**, Ellenbecker Dep. 125:13-18, 128:10-18). Furthermore, Dr. Ellenbecker agrees that some of the activities outlined in some of the studies he cites are not the type of activities that Mr. Hoff testified he performed in maintenance of aircraft engines. (**Ex. 2**, Ellenbecker Dep. 208:1-7).

Moreover, many of the gasket studies on which Dr. Ellenbecker relies involve industrial uses of gaskets in high pressure, high temperature steam lines and on pumps and valves in those lines. (**Ex. 2**, Ellenbecker Dep. 160:20-161:10). In order for Dr. Ellenbecker to rely on these gasket studies, he had to make a number of unsupported assumptions. First, he had to *assume* that

the gaskets used on aircraft engines were made of the same or similar materials and in the same fashion as the gaskets in the studies he cites. (**Ex. 2**, Ellenbecker Dep. 161:16-162:11). He would also have to *assume* the gaskets used in the aviation context reacted over time in the same manner as the gaskets in the valve studies. He admitted, however, that he did not know whether the steam line environment is more or less severe than the environment of a jet engine, and he has done nothing to investigate this issue. (**Ex. 2**, Ellenbecker Dep. 162:12-163:6). Indeed, Dr. Ellenbecker does not know the temperature of the medium flowing through a jet engine. (**Ex. 2**, Ellenbecker Dep. 163:21-23). He also does not know the temperature of the steam in the flanges or valves in the steam systems from the gasket studies he cites. (**Ex. 2**, Ellenbecker Dep. 163:24-164:1). Lastly, Dr. Ellenbecker would also have to *assume* that the aviation gaskets were used for a long enough period of time to allow them to adhere to the mating surfaces in the same way as the gaskets in the steam valve studies.[5] Yet, he testified that he does not know how long a gasket remains in a jet engine in the Air Force. (**Ex. 2**, Ellenbecker Dep. 163:7-9). He also does not know how long the gaskets in the studies he relied on stayed in the steam system flanges, pumps, and/or valves. (**Ex. 2**, Ellenbecker Dep. 163:10-14).

Dr. Ellenbecker has not done any investigation to determine if there is any factual support for his assumptions. He has not performed any research or investigation to determine if the gaskets used in the aviation context are similar to the gaskets used in the high-pressure steam system studies he relies on. He has not performed any research or investigation on the useful life of a gasket used in the aviation context versus a gasket used in an industrial steam line. And finally, he has not performed any research or investigation to determine if gaskets used in the aviation

[5] Even Mr. Hoff agreed that the condition of the gaskets from aviation engines are sometimes wet with fluid when removed. (*See* Relevant Excerpts from Mr. Hoff's Deposition on 4/26/23, attached hereto as **Ex. 7** at 148:11-17).

context adhere to the mating surfaces in the same or similar fashion that the gaskets used in steam system valve studies adhered to the mating surfaces.

Simply put, there is no evidence to support the assumptions made by Dr. Ellenbecker. The studies and papers that he cites to support his pre-conceived conclusions do not comport with the facts of this case, and in most if not all instances, are not even remotely analogous. His assumptions are thus based on speculation, and his methodology in comparing Mr. Hoff's supposed exposure levels in an aviation setting with exposure levels in the industrial steam line gasket and insulation studies is fundamentally flawed. As such, Dr. Ellenbecker's opinions must be precluded in this case. *See Daubert II*, 43 F.3d at 1317 ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.").

**B. Dr. Ellenbecker Ignored Publicly-Available, Peer-Reviewed Studies Regarding Dust Release from Aviation Engines in Reaching His Conclusions.**

Dr. Ellenbecker selectively chose to ignore published aviation engine maintenance air sampling studies because they do not support his opinions and instead rely on studies involving removal of gaskets from steam lines, large industrial steam valves, and pumps. Although Dr. Ellenbecker admits he is aware of peer-reviewed published air sampling studies focused on work performed by aviation mechanics and exposure to asbestos, he chose not to rely on them because he does not think the aviation engine mechanic air sampling studies "tells us much." (**Ex. 2**, Ellenbecker Dep. 140:14-22).

One of the two published studies that Dr. Ellenbecker selectively chose to ignore because it did not support his opinions was authored by industrial hygienists Steven Mlynarek and Drew Van Orden in 2012 and examined the asbestos exposure experienced by certified aviation engine

mechanics performing complete tear-down and rebuild of a JT3D Pratt & Whitney engine jet engine in 2007.[6] All potentially asbestos-containing parts on this engine were bulk-sampled to confirm that components such as gaskets and clamps that were removed and replaced were asbestos-containing, and Dr. Mlynarek performed air sampling during the entire tear-down and rebuild procedure.

The purpose of the 2007 Mlynarek study was to "evaluate the potential exposures to aircraft mechanics [from working on] a Pratt & Whitney JT3D jet engine [that] was obtained and overhauled by experienced mechanics using tools and work practices similar to those used since the time this engine was manufactured." Mlynarek, S.P. and D.R. Van Orden, "Assessment of potential asbestos exposures from jet engine overhaul work," *Regulatory Toxicology and Pharmacology* 63 (2012) 78-83 (hereinafter "2007 Mlynarek Study"), attached hereto as **Ex. 8**. The overhaul work "was done by, and under the supervision of, mechanics experienced in jet engine overhaul work," and the "work practices used were the same as those used at any point in the history of this engine." (**Ex. 8**, 2007 Mlynarek Study at p. 80). The work was observed to be "dirty and oily." (**Ex. 8**, 2007 Mlynarek Study at p. 82). In fact, "[o]n almost all days, all of the gaskets, O-rings, seals, and similar items observed as they were being removed were oily, or at least not dry." (*Id.*) This was reported as typical by aviation experts on site. (*Id.*) During the 2007 study, dust measurements were taken, and based on those measurements, the authors concluded that "the disturbance of asbestos-containing gaskets, O-rings, and other types of

[6] Dr. Ellenbecker also ignored another published study authored by Steven Mlynarek and Drew Van Orden in 2012, which studied asbestos exposure experienced by airplane piston engine mechanics performing overhaul work on a Pratt & Whitney R2800 radial engine in 2004. While this study was done on a piston engine rather than a jet engine it is still instructive and more analogous to Mr. Hoff's work than the studies that Dr. Ellenbecker cites. During the 2004 study, dust measurements were taken, and based on those measurements, the authors concluded that "during overhauls or service work on airplane piston engines at customary environmental conditions, the asbestos exposures of mechanics and bystanders are the same or less than ambient background levels, several orders of magnitude below OSHA exposure regulations, both current and historic."

asbestos-containing components, while performing overhaul work to a jet engine produces very few airborne fibers, and [] virtually none of these aerosolized fibers is asbestos."[7] (*Id.*) The overall results of the study supported the conclusion that:

> [T]he asbestos exposures of persons who performed overhaul work to similar jet engines, and bystanders to these activities, are negligible, or the same or less than ambient background levels. Although performing this work may produce some airborne dust, including a low number of fibers as analyzed by PCM, TEM analysis shows virtually none of these airborne fibers to be asbestos. The airborne asbestos personal exposure of workers engaged in the overhaul of jet engines was at or below background ambient levels. The airborne asbestos area exposures of workers engaged in the overhaul of jet engines was at ambient levels, several orders of magnitude below OSHA exposure regulations, both current and historic.

When asked why he did not analyze or at least cite either of these studies in his report, Dr. Ellenbecker testified that it was because he did not think the data was "particularly relevant." (**Ex. 2**, Ellenbecker Dep. 136:7-12). In other words, these studies do not support—and in fact contradict—Dr. Ellenbecker's opinions in this case so he chose to ignore them. This is another reason why Dr. Ellenbecker's opinions should be excluded as unreliable.

At his deposition, Dr. Ellenbecker provided his criticisms of the Mlynarek studies as an explanation for why he failed to consider them when forming his opinions. First, Dr. Ellenbecker takes issue with the fact that the Mlynarek studies do not focus on the health effects of asbestos or discuss that asbestos is a human carcinogen. Ultimately, Dr. Ellenbecker agrees that the studies do talk about asbestos being a carcinogen "barely." (**Ex. 2**, Ellenbecker Dep. 182:17-22). Although he thinks that every article written about asbestos should emphasize that asbestos is a carcinogen, Dr. Ellenbecker acknowledges that many do not. (**Ex. 2**, Ellenbecker Dep. 182:23-183:8). Dr. Ellenbecker also criticizes Mlynarek for not recognizing or saying anything about low level exposures or recognizing that every exposure contributes to the risk of developing

[7] The study was conducted over several days on March 12-21, 2006, June 25-30, 2006, and Nov. 12-17, 2006.

mesothelioma. He also surmises that it is "possible" that by the time the tests were conducted, much of the asbestos that was originally on a jet engine was "likely removed and was not present" when measuring fiber release. (**Ex. 2**, Ellenbecker Dep. 183:22-184:12). Finally, Dr. Ellenbecker does not think it was proper to use the indirect method set forth in NIOSH 7402 to quantify exposures to asbestos; therefore, he thinks that the TEM analysis is not meaningful. That said, Dr. Ellenbecker does not claim that Mlynarek did anything wrong in using NIOSH 7402 in his analysis. (**Ex. 2**, Ellenbecker Dep. 174:21-175:5). Indeed, he admits that 7402 has been around for 36 years and that NIOSH has not tried to get rid of it. (**Ex. 2**, Ellenbecker Dep. 181:14-19).

In sum, Dr. Ellenbecker's criticisms of the Mlynarek studies are not based on scientific reliability. Dr. Ellenbecker does not dispute that the studies were conducted in accordance with accepted industry standards and based on reliable principles and methods. Instead, he finds fault with the fact that the results of the Mlynarek studies contradict his own held beliefs and unsupported opinions. Because Dr. Ellenbecker ignored relevant scientific literature tending to refute his opinions and did not consider those studies or how they impact his opinions, his opinions as to RTX in this case are inherently unreliable and must be excluded.

## III. DR. ELLENBECKER'S THEORY THAT ALL EXPOSURES CONTRIBUTE TO THE RISK OF DEVELOPING MESOTHELIOMA CANNOT BE PROVEN TRUE OR FALSE AND THE METHODOLOGIES CANNOT BE REPLICATED.

At the core of Dr. Ellenbecker's opinions is the theory that any amount of asbestos exposure has the capacity to cause cancer because there is supposedly "no safe" level of exposure to asbestos. This theory is not based on methods generally accepted in the scientific community or otherwise demonstrated to be reliable. This type of unsupported science, which is not a product of reliable principles and methods, is prohibited under Rule 702 of the Federal Rules of Evidence, and the standard set forth by the Supreme Court in *Daubert* and must, therefore, be excluded.

Dr. Ellenbecker testified that it is his opinion that each exposure to asbestos Mr. Hoff had increased his risk for the development of mesothelioma, no matter how small the exposure was. (**Ex. 2**, Ellenbecker Dep. 95:12-20). Often in asbestos litigation, plaintiffs' experts proffer opinions that "all exposures above background" increase the risk of developing an asbestos-related disease. But Dr. Ellenbecker takes this "theory" a step further. Dr. Ellenbecker testified that it is his opinion that even exposures at background levels in the ambient air increase a person's risk for the development of mesothelioma and lung cancer. (**Ex. 2**, Ellenbecker Dep. 95:21-96:2). Dr. Ellenbecker is of the opinion that each exposure to asbestos increases one's risk for the development of mesothelioma, no matter how low the concentration of that exposure to airborne asbestos is and no matter how infrequent those exposures are. (**Ex. 2**, Ellenbecker Dep. 97:8-97:20). It is his opinion that even the inhalation of a single airborne asbestos fiber increases a person's risk for the development of mesothelioma or lung cancer. (**Ex. 2**, Ellenbecker Dep. 98:15-20). Although Dr. Ellenbecker concedes that the risk of developing mesothelioma or lung cancer from inhaling one asbestos fiber is exceedingly low, he also insists that "it can't be zero," underscoring the "no safe" level of exposure theory.

Like nearly all long-latency diseases, cancers of the lung (whether mesothelioma or lung cancer) are dose-response diseases, meaning a disease induced by a dose of a toxin sufficient to cause the response. *See, e.g.*, *Federal Judicial Center: Reference Manual on Scientific Evidence*, "Reference Guide on Toxicology." (noting first central tenet of toxicology is that "the dose makes the poison"). Logically, competent information to meaningfully evaluate a person's dose would be required to establish causation. However, Dr. Ellenbecker has not made any attempt to quantify any of Mr. Hoff's alleged exposures, thereby rendering the "dose" aspect of the dose-response equation unknown. In fact, Dr. Ellenbecker testified that he did not believe there was enough

information for him to quantify Mr. Hoff's exposures. Instead, Dr. Ellenbecker falls back on a logical fallacy to excuse the lack of underlying data. *See* Fed. R. Evid. 702 advisory committee's note ("Subpart (1) of Rule 702 calls for a quantitative rather than qualitative analysis."). Specifically, he will opine that since there is no scientific evidence that a particular exposure or set of exposures, whether defined by time of exposure, brand of product, fiber types, or any other characteristic, can be excluded from a causative role in the development of mesothelioma, they must all be considered causative. Since no exposures can be excluded, Dr. Ellenbecker will assume that all exposures should be included. Rather than rely on data and scientific evidence, these opinions point to the *absence* of scientific evidence to justify a mere assumption that all exposures caused the disease. In short, these opinions are based on nothing more than *ipse dixit*. *See Perkins v. Origin Medsystems, Inc.*, 299 F. Supp. 2d 45, 54 (D. Conn. 2004) ("[A]n expert's testimony must be held inadmissible if there is simply too great an analytical gap between the data and the opinion proffered, such that the opinion is connected to the existing data only by the *ipse dixit* of the expert.") (quoting *Amorgianos*, 303 F.3d at 266 and *Joiner*, 522 U.S. at 146).

Despite Dr. Ellenbecker claiming that he did not have enough information to perform a quantitative assessment of Mr. Hoff's exposures, Plaintiffs also argue—circuitously—that no measurement is necessary because Mr. Hoff's exposure was not minimal but was sufficiently "elevated" and "frequent" to cause his disease. (**Ex. 1**, Ellenbecker Report p. 22, 28, 33). Yet Plaintiffs fail to explain how the exposure can be characterized as "elevated" and "frequent" in the absence of an objective measurement of the dosage. Plaintiffs reject basic tenets and principles of toxicology—and would ask that this court do the same—and argue that quantification of the asbestos dosage is not critical. This argument fails because:

> *A fundamental tenet of toxicology is that the "dose makes the poison"* and that all chemical agents, including water, are harmful if consumed in large quantities, while

> even the most toxic substances are harmless in minute quantities. . . . Therefore, in determining whether plaintiffs' exposure to [the chemical agent] could have caused any illness that they have, it is necessary to establish the dose-response relationship between [the chemical agent] and those particular illnesses.

*Federal Judicial Center: Reference Manual on Scientific Evidence*, "Reference Guide on Toxicology." (emphasis added). "While precise or exact information concerning dosage or dose-response relationship is not always required, the boundaries of allowable expert testimony are not so wide as to permit an expert to testify as to specific causation without having any measurements of plaintiff's exposure to the allegedly harmful substance." *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1157 (E.D. Wash. 2009); *accord K.E. v. GlaxoSmithKline LLC*, No. 3:14-cv-1294, 2017 WL 440242, at *4 (D. Conn. Feb. 1, 2017) (noting duration and amount of exposure is crucial to an expert's causation opinion, especially "where, as here, a substance is allegedly toxic or teratogenic only at certain levels, but can be consumed safely at others".).

In rejecting the dosage requirement, Plaintiffs are reduced to espousing the "linear no-threshold model" of causation. This theory has never been medically or scientifically tested (and therefore not established, scientifically), has never survived a peer-review process, has no known rate of error, and is not generally accepted within any scientific field outside of a courtroom. For these reasons, courts across the country have excluded it in asbestos cases. *See, e.g.*, *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 677 (7th Cir. 2017) ("More than thirty other federal courts and state courts have held that this cumulative 'any exposure' theory is not reliable.").[8] These opinions are

---

[8] *See also Fend v. Allen-Bradley Company*, E.D. Pa. No. 17-1701, Order on Motion i*n Limine* by the Honorable Anita B. Brody (Nov. 30, 2022); *Johnson v. Edward Orton, Jr. Ceramic Found.*, No. 19-cv-06937, 2021 WL 5493231, at *3 (N.D. Ill. Nov. 23, 2021); *Clarke v. Air & Liquid Sys. Corp.*, No. 2:20-cv-00591-SVW-JC, 2021 WL 1534975, at *10 (C.D. Cal. Mar. 18, 2021); *Dugger v. Union Carbide Corp.*, No. CCB-16-3912, 2019 WL 4750568, at *5 (D. Md. Sept. 30, 2019); *Barabin v. Scapa Dryer Fabric, Inc.*, 2018 WL 840147, at *14-15 (W.D. Wash. Feb. 12, 2018); *Doolin v. Ford Motor Co.*, No. 3:16-cv-778-J-34PDB, 2018 WL 4599715, at *13 (M.D. Fla. Sept. 25, 2018); *Schwartz v. Honeywell Intl., Inc.*, 102 N.E.3d 477 (Ohio 2018); *Stallings v. Georgia-Pacific Corp.*, 675 F. Appx. 548, 551-52 (6th Cir. 2017); *Rockman v. Union Carbide Corp.*, 266 F. Supp. 3d 839, 850 (D. Md. 2017); *Haskins v. 3M Co.*, No. 2:15-CV-02086-DCN, 2017 WL 3118017, at *19-20 (D. S.C. 2017); *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1177-78 (9th Cir. 2016); *Scapa Dryer Fabrics, Inc. v. Knight*, 788 S.E.2d 421, 426 (Ga. 2016); *Comardelle v.*

well-reasoned and reflect a growing discontent by judges with these experts' effort to encompass even the most minimal of exposures in asbestos litigation today. Each of these courts understood that this theory is nothing more than unproven and unsupported opinion evidence that falls far short of satisfying the admissibility requirements for expert testimony.

Plaintiffs in other toxic tort cases not involving asbestos have attempted to proffer expert testimony based on this theory as well. However, the majority of those courts recognized it is contrary to science and not a proper subject of expert testimony. *See, e.g.*, *Milward v. Acuity Specialty Prods. Grp., Inc.*, 969 F. Supp. 2d 101, 110 (D. Mass. 2013) (noting this model is "merely a hypothesis" with "no known or potential rate of error") (citing *Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 25 (D. Mass. 1995)); *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 878 n.9 (S.D. Ohio 2010) ("While the one-hit theory has been accepted for purposes of establishing regulatory safety standards, it has not been accepted as a reliable theory for causation under *Daubert* standards."); *Henricksen*, 605 F. Supp. 2d at 1165-66 (E.D. Wash. 2009) ("The use of the no safe level or linear no threshold model . . . flies in the face of the toxicological law of dose-response, that is, that the dose makes the poison.") (internal quotation marks omitted); *Blanchard*

---

*Pa. Gen. Ins.*, 76 F. Supp. 3d 628, 633 (E.D. La. 2015); *Krik v. Crane Co.*, 76 F. Supp. 3d 747, 750-55 (N.D. Ill. 2014); *Vedros v. Northrop Grumman Shipbuilding, Inc.*, 119 F. Supp. 3d 556, 565 (E.D. La. 2015); *Yates v. Ford Motor Co.*, 113 F. Supp. 3d 841, 847-47 (E.D.N.C. 2015); *In re New York City Asbestos Litig.*, 11 N.Y.S.3d 416, 437 (N.Y. Sup. Ct. 2015); *Davidson v. Georgia Pacific LLC*, No. 12-1463, 2014 WL 3510268, at *5 (W.D. La. July 14, 2014); *Bostic v. Georgia-Pacific Corp.*, 439 S.W. 332, 338 (Tex. 2014); *Sclafani v. Air and Liquid Sys. Corp.*, No. 2:12-cv-3013-svw-pjw, 2013 WL 2477077, at *4 (C.D. Cal. May 9, 2013); *Anderson v. Ford Motor Co.*, 950 F. Supp. 2d 1217 (D. Utah 2013); *Smith v. Ford Motor Co.*, No 2:08-cv-630, 2013 WL 214378, at *3 (D. Utah Jan. 18, 2013); *Howard v. A.W. Chesterton Co.*, 78 A.3d 605, 609 (Pa. 2013); *Betz v. Pneumo Abex, LLC*, 44 A.3d 27, 56 (Pa. 2012); *Zellers v. NexTech Northeast, LLC*, 895 F. Supp. 2d 734, 739 (E.D. Va. 2012); *Butler v. Union Carbide Corp.*, 712 S.E.2d 537, 540-44 (Ga. App. 2011); *Smith v. Kelly-Moore Paint Co.*, 307 S.W.3d 829 (Texas App. Ct. 2010); *Martin v. Cincinnati Gas & Electric Co.*, 561 F.3d 439 (6th Cir. 2009); *Nelson v. Am. Std.*, No. 081201335, 2008 WL 10718826, at *14-15 (Pa. Com. Pl. Sept. 24, 2008); *In re Asbestos Litig.*, 2008 WL 4600385 (Pa. Com. Pl. Sept. 24, 2008); *Free v. Ametek*, No. 07-2-04091-9 SEA, slip op. at 3-5 (Sup. Ct. King Cty. Wash. Feb. 29, 2008); *Basile v. Am. Honda Motor Co., Inc.*, No. 11484 CD 2005, 2007 WL 712049, at *2 (C. P. Indiana Feb. 22, 2007); *Gregg v. V-J Auto Parts Co.*, 943 A.2d 216, 226 (Pa. 2007); *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 773 (Tex. 2007); *Georgia-Pacific Corp. v. Stephens*, 239 S.W.3d 304, 320-21 (Tex. App. Ct. 2007); *In re W.R. Grace & Co.*, 355 B.R. 462, 476 (Bankr. D. Del. 2006); *In re Toxic Substance Cases*, No. A.D. 03-319, 2006 WL 2404008, at *1 (Pa. Com. Pl. Aug. 17, 2006); *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 493 (6th Cir. 2005); *Summers v. CertainTeed Corp.*, 886 A.2d 240, 244 (Pa. Super. 2005); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278 (5th Cir. 1998).

*v. Goodyear Tire & Rubber*, 30 A.3d 1271, 1277 (affirming grant of summary judgement where plaintiff failed to demonstrate presence of benzene attributable to defendant absent which "a jury could only wildly speculate on the level of plaintiff's exposure to any such benzene and on the relationship between any such exposure and plaintiff's disease".); *Parker v. Mobil Oil Corp.*, 857 N.E.2d 1114, 1121-22 (N.Y. 2006) (concluding opinions of plaintiff's experts properly deemed insufficient to defeat summary judgment where experts did not attempt to quantify or assess any actual dose).

The opinion that all exposures to asbestos increase the risk of developing mesothelioma, even including background exposures in the ambient air, is both scientifically and legally invalid and should be precluded. Such testimony cannot substitute for the legally required evidence of causation—evidence of a substantial, beyond minimal, exposure and a medical link between that exposure and the disease contracted. As such, permitting evidence of the each and every exposure opinion would serve no useful or legally permissible purpose, and it is properly excluded on relevance grounds.

## IV. DR. ELLENBECKER'S OPINIONS AND TESTIMONY WILL NOT HELP THE TRIER OF FACT UNDERSTAND THE EVIDENCE OR DETERMINE THE FACTS IN ISSUE AND THE INTRODUCTION OF SUCH TESTIMONY IS PREJUDICIAL TO RTX.

Dr. Ellenbecker's opinions, and the methodology upon which those opinions are based, lack the reliability required of an expert and are speculative, without foundation and are not based on sufficient facts and data. Moreover, any probative value Dr. Ellenbecker's "expert" opinions may have (and there is none) is substantially outweighed by the danger of confusing and misleading the jury, and therefore prejudicial to RTX. The studies he relies on are precisely the type of evidence Rules 403 and 702 of the Federal Rules of Evidence were designed to proscribe. The undue prejudice that RTX would suffer is clear. Dr. Ellenbecker cherry-picked studies from

different industries and in different settings that Mr. Hoff's work in an effort to exaggerate and embellish the actual conditions under which he performed his work and the actual conditions under which he was potentially exposed to dust, asbestos-containing or otherwise. Courts have consistently excluded expert testimony that "cherry-picks" relevant data as unreliable. *See, e.g.*, *E.E.O.C. v. Freeman*, 778 F.3d 463, 469-70 (4th Cir. 2015); *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Secs. (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014); *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1086 (D.C. Cir. 2011); *Barber v. United Airlines, Inc.*, 17 F. App'x. 433, 437 (7th Cir. 2001); *Fail-Safe, LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 891 (E.D. Wis. 2010); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176-77 (N.D. Cal. 2007). Dr. Ellenbecker's opinions and testimony regarding those studies and papers are designed to inflame and mislead the jury and must be excluded as such.

## CONCLUSION

WHEREFORE, Defendant RTX Corporation respectfully requests that this Court issue an order precluding Plaintiffs' expert, Dr. Ellenbecker, from offering any opinions at trial regarding any asbestos-containing product, part, or component for which RTX is responsible or that Mr. Hoff had an increased risk of developing mesothelioma and/or lung cancer from his work with or around Pratt & Whitney engines.

Dated: November 24, 2025

The Defendant,
RTX CORPORATION,

By its attorneys,

*/s/ Judith A. Perritano*
Judith A. Perritano (ct31663)
Carlie S. Seigal (ct30421)
PIERCE DAVIS & PERRITANO LLP
10 Post Office Square, Suite 1100N
Boston, MA 02109
617-350-0950
jperritano@piercedavis.com
cseigal@piercedavis.com

Lance Wilson (phv208801)
COSMICH SIMMONS & BROWN LLP
7250 Redwood Blvd., Suite 300
Novato, CA 94945
415-568-7290
lance.wilson@cs-law.com

## CERTIFICATE OF SERVICE

I, Judith A. Perritano, hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 24th day of November 2025.

*/s/ Judith A. Perritano*
Judith A. Perritano