UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RAYMOND A. HOFF and NANCY B. HOFF, Plaintiffs, <br> v. <br> AVCO CORPORATION, et al., Defendants. | C.A. No.: 3:24-cv-00206-SFR |

**DECLARATION OF JOHN C. SUMNER IN SUPPORT OF DEFENDANT RTX CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

I, John C. Sumner, declare and state as follows:

1. I am over the age of 18 years and am competent to testify to the facts set forth in this declaration. I have personal knowledge of the facts contained in this declaration.

2. I have been involved in the aerospace industry since 1965. I graduated from Western New England University in Springfield, Massachusetts, with a BS in Mechanical Engineering and later earned a Master of Business Administration degree from the same school. I was hired by Pratt & Whitney in East Hartford, Connecticut, as an aerospace engineer in 1965. Pratt & Whitney, an unincorporated division of Raytheon Technologies Corporation, designs and manufactures aviation engines, including aircraft engines used in United States military aircraft. I worked for Pratt & Whitney from 1965 until my retirement in 2001. During the time that I worked for Pratt & Whitney, I had many roles and duties. I started as an experimental test engineer and retired as a manager of customer technical service. Over the course of my career, I was involved with military contracts, supervised personnel, and assisted with the development of aviation engines and the maintenance of those engines. I participated in the day-to-day affairs of Pratt & Whitney and its engineering departments and interacted with experienced peer groups within Pratt

& Whitney. I have reviewed historical engine documents, including model specifications, design and construction drawings, schematics, and engineering data dating back to the 1930s. The historical records I reviewed identified precise military specifications that were followed in the design and manufacture of the engines and documented the submission and approval process.

3. I have continued to work for Pratt & Whitney as a consultant-contractor, primarily in locating and reviewing records related to legacy engine design and production. I have spent hundreds and probably thousands of hours searching for, locating, and reviewing contracts, drawings, correspondence, commercial specifications, military specifications, engineering change orders, and other documents with the purpose of identifying the use of asbestos-containing components on Pratt & Whitney engines dating back to the 1920s. I have searched for the specifications that identify the materials used for all known possible asbestos-containing parts and examined where each such part is located on the engine and its application.

4. Based upon my work experience with engines that Pratt & Whitney supplied to the United States military and my review of extensive historical records, including records relating to Pratt & Whitney legacy military engine programs, I am familiar with the manner in which Pratt & Whitney military engines were designed, built, and supplied to the U.S. Air Force. I have knowledge of the extent of the involvement of the U.S. military in the design, manufacture, approval, and receipt of the military aircraft engines designed and manufactured by Pratt & Whitney. The manner in which the Air Force contracted with Pratt & Whitney for aircraft engines, as described herein, was typical of the performance of all engine contracts between Pratt & Whitney and the U.S. military.

5. Based on my nearly four decades as an aerospace engineer for Pratt & Whitney, where I was involved in the design and maintenance of aviation engines, as well as the extensive

historical document reviews that I have performed during the past 20 years as a consultant regarding the contracting process for military engines at Pratt & Whitney, I can testify that the system for submission and approval by the U.S. military described herein was in use at Pratt & Whitney dating back to the 1930s. I have reviewed historical engine documents, including model specifications, design and construction drawings, schematics, and engineering data dating back to the 1930s. The historical records I reviewed identified the precise military specifications that were followed in the design and manufacture of the engines and documented the submission and approval process.

6. I am informed and believe that plaintiff Raymond Hoff allegedly inhaled respirable asbestos fibers released from gaskets, clamps, insulation blankets, vapor barriers, fire sleeves, and hydraulic tubing and lines on Pratt & Whitney J57 engines that powered North American F-100C/D Super Sabre, McDonnell F-101B Voodoo, Boeing B-52F/G Stratofortress, and Boeing KC-135A Stratotanker military aircraft and Pratt & Whitney TF33 engines that powered Boeing B-52H Stratofortress military aircraft while serving in the United States Air Force from 1969-1980.

7. The Pratt & Whitney J57 and TF33 engines at issue in this case were manufactured and delivered to the United States Air Force prior to Plaintiff's military service.

8. The Pratt & Whitney J57 and TF33 engine models at issue contained several hundreds of parts, the vast majority of which were made of metal only. While some of the gaskets and cushioned loop clamps on the above Pratt & Whitney engines contained chrysotile asbestos encapsulated in a binding agent, such as Teflon, many of the gaskets and clamps used on the engines did not contain any asbestos. Further, most of the work activities associated with J57 and TF33 engines do not involve parts that contain asbestos.

9. Pratt & Whitney did not specify or supply any asbestos-containing blankets or asbestos-containing heat shields in connection with the J57 or TF33 engines it manufactured for the U.S. Air Force for use on the aircraft at issue. In fact, all of the heat shields that were used on the J57 and TF33 engines at issue were made of metal only or used a non-asbestos refractory material inside a welded metal shell. Further, Pratt & Whitney did not specify or supply the vapor barrier identified by Plaintiff or any fire sleeves or insulated hydraulic tubes or hoses on the Pratt & Whitney engines at issue.

10. Mr. Hoff testified that his work on J57 and TF33 engines included tearing down the engines in order to make repairs. As part of this "tear-down" process, Mr. Hoff removed and replaced damaged components of the QEC kit, which included tubing, gaskets, clamps, hydraulic pumps, generators, and insulation blankets.

11. The QEC or Quick Engine Change kit is comprised of the components that are necessary to connect an engine to an airframe. The QEC kits used on the aircraft at issue were not designed, manufactured, or supplied by Pratt & Whitney.

12. After the J57 and TF33 engines at issue were sold and delivered, the airframe manufacturer and/or the United States Air Force added any fire sleeves, external insulation blankets, the vapor barrier, and other QEC components to the engine in order to connect the engine with the airframe. Pratt & Whitney was not involved in affixing any of these parts to its engines. Pratt & Whitney's only role with respect to these parts was to coordinate with the airframer on where the parts would attach to Pratt & Whitney's engines prior to the engine shipment to the airframer. Pratt & Whitney played no role in designing these parts, nor did Pratt & Whitney control, specify or direct that asbestos be used in any of these parts.

13. Based upon my 36 years of employment at Pratt & Whitney and the subsequent 24 years where I have served as a consultant for Pratt & Whitney performing research into the historical process of contracting for, designing and producing military aircraft engines, I have knowledge of the extent of the involvement of the U.S. government, primarily through the U.S. armed forces, in the design, manufacture, approval, and receipt of the military aircraft engines designed and manufactured by Pratt & Whitney. I submit this affidavit to attest to the level of supervision, control, and approval by the U.S. military and its officers over the design and manufacture of all Pratt & Whitney aircraft engines intended for use by the U.S. military and government.

14. During all aspects of its design and manufacture of military aircraft engines supplied to the U.S. Air Force (i.e., design, manufacture, and testing of such engines), Pratt & Whitney performed its work under the on-site and continuous oversight of the U.S. military. The U.S. military would review and approve or reject engineering and design proposals from Pratt & Whitney. This oversight and approval process occurred through contract documents, design and construction drawings, written specifications, and day-to-day personal oversight of Pratt & Whitney's work by military engineers, military inspectors and military specialists who were resident on-site at Pratt & Whitney. All phases of development, manufacture, and testing for the engines intended for use by the Air Force were subject to this supervision and control.

15. A contract with the U.S. military to deliver an aircraft engine such as the J57 or the TF33 had a development stage and a production phase. The entire process was governed, step by step, by very specific procedures set forth in technical orders adopted and published by the federal government and referred to as "Military Specifications." The United States government approves and publishes these Military Specifications for use by military contractors, like Pratt & Whitney,

who design and manufacture military equipment and weapons systems for use by the U.S. military. The government requires contractors to use standard Military Specifications when designing and manufacturing military equipment wherever possible and practical, which promoted standardization and inventory efficiency. Military Specifications governed the procedures for designing, inspecting, testing, and accepting aviation engines, and also set forth standardized engine parts/components and materials required for use on the engine. Many Military Specifications required asbestos in certain standardized parts, such as clamps and gaskets. Pratt & Whitney was obligated to design its military engines in strict accordance with Military Specification procedures and to include parts and components set forth in Military Specifications wherever applicable and practical. Failure to follow and use applicable Military Specifications resulted in the rejection of the engines by the military and/or loss of the contract.

16. During the development stage, the military provided extensive and detailed performance and construction specifications incorporated into contracts for the design and manufacture of Pratt & Whitney J57 and TF33 engines. MIL-E-5007 provided the design requirements, operating characteristics, performance requirements, detailed configuration definitions, construction standards, mandatory qualification and acceptance testing procedures, and documentation requirements for military aircraft engines. The design requirements set forth in MIL-E-5007 cover all aspects of the design of turbojet and turbofan engines to power U.S. military aircraft, including the J57 and TF33 engines that powered the military aircraft at issue. True and correct copies of MIL-E-5007B and C, which would have been incorporated in Pratt & Whitney's contracts with the U.S. military for the production of engines like the J57 and TF33, are attached hereto as **Exhibits A and B.**

17. MIL-E-5007B and C, and their previous iterations, included design and construction requirements for component parts, and each of the specifications for the component parts had, in turn, a set of underlying specifications of its own. Additionally, Air Force-Navy Aeronautical (ANA) Bulletin No. 343 (later known as MIL-BUL-343), which was expressly incorporated into MIL-E-5007, included design and construction requirements for component parts, and each of the specifications for the component parts. MIL-E-5007 mandated compliance with Military Specifications and the use of military standard parts developed specifically for use in aircraft engines. No changes to the design or material of parts listed in an approved engine parts list could be made without approval by the U.S. Air Force in accordance with the applicable contract requirements. For example, MIL-E-5007B at Paragraph 3.5, p. 5, states:

> **3.5. Materials and processes**. Materials and processes used in the manufacture of military turbojet engines, shall be of high quality, suitable for the purpose, and shall conform to applicable specifications in accordance with ANA Bulletin No. 343. When an engine manufacturer's specifications are used for materials and processes, such specifications shall be submitted to the Government for review prior to qualification tests and unless specifically disapproved, shall be considered released upon satisfactory completion of the requirements of MIL-E-5009. The use of nongovernmental specifications shall not constitute waiver of Government inspection.

18. The U.S. military not only approved the use of asbestos-containing components in Pratt & Whitney aircraft engines built for the Air Force, but in many instances required it. Specifically, MIL-E-5007B [Section 3.6.1] and MIL-E-5007C [Section 3.6.1] required Pratt & Whitney to use AN and MS standard parts. For example, per these specifications, Pratt & Whitney J57 military engines incorporated copper crush gaskets for junctures on bleed valve tubes and oil

tubes in conformance with military specification AN900, GASKET – COPPER – ASBESTOS ANNULAR. Pursuant to this military specification, these gaskets were required to contain an encapsulated inner layer of asbestos. A true and correct copy of AN900 is attached hereto as **Exhibit C**.

19. Additional examples of military specifications and standards for aircraft and aircraft engines that required the use of asbestos, and which were required for use by the contractor where applicable, including on the J57 and TF33 engine, are collectively attached hereto as **Exhibit D** and include:

- MIL-A-7021B: Asbestos sheet gaskets for fuel, lubricant, coolant, water, and high temperature applications.
- AN123022, AN123023, AN123024, AN123025, AN123026, AN123027, AN123029, AN123031, AN123034, AN123035, AN123038, AN123039, and AN123040: Asbestos-containing aluminum, annular gasket.
- MS9134-01, for mounting tachometers to accessory pads on military engines.
- MS9136-01, for mounting multiple types of accessories to accessory pads on military engines.

These are just a sampling of military specifications and standards calling for the use of asbestos-containing components that manufacturers like Pratt & Whitney were required to use in the design and manufacture of J57 and TF33 military aircraft engines.

20. Even if an asbestos-containing component was not specifically called out in a military specification or standard, the military was aware of, and had to approve the use of, that component and its material composition. Military contracts required Pratt & Whitney to submit detailed engine drawings, schematics, model specifications, monthly progress reports, and

engineering data to the military for review and approval before production could begin. See, Paragraph 3.7, "Drawings and Diagrams" in MIL-E-5007B and MIL-E-5007C, attached as **Exhibits A and B**.

21. The military could require changes in design, materials, and documentation before approving the design and authorizing manufacture of the equipment. These detailed drawings included a bill of materials identifying every part used in the engine and a description of the material composition of those parts. These drawings, which were approved by the military, indicated precisely where asbestos materials would be used in various parts of the engines. The military and its engineers engaged in a thorough review of the drawings, schematics, model specifications, and engineering data and had to approve the drawings before production of the engines commenced. In short, the military was fully aware of all the materials used in Pratt & Whitney aircraft engines, and if a Pratt & Whitney J57 or TF33 aircraft engine supplied to the military contained an asbestos-containing component, then use of that asbestos-containing component was either mandated by the military or was reviewed and approved by the military and its engineers.

22. The design, specification, and manufacture of the Pratt & Whitney aircraft engines supplied to the U.S. Air Force were approved by the appropriate military personnel after careful deliberation and meetings with Pratt & Whitney engineers. There was a continuous back and forth exchange between Pratt & Whitney and military engineers during each phase of the production of the J57 and TF33 engines, including the design phase, as evidenced by numerous Engineering Change Proposals (ECPs), such as ECP 54230, dated May 1954. ECP 54230 addresses accessory drives and pads on the J57 engine, including the requirement for new mounting gaskets. ECP

54230 was approved by the military Bureau of Aeronautics engineers (BuAer) but disapproved by the Air Force. A true and correct copy of ECP 54230 is attached as **Exhibit E**.

23. The final design of the engines submitted to the military for review and approval, including the use of asbestos and non-asbestos-containing components, was the result of this collaborative effort between Pratt & Whitney and the military engineers. This back-and-forth was contractually mandated with respect to any design or material changes to military engines. See Paragraph 3.8.2, "Changes in Design" in MIL-E-5007B and MIL-E-5007C, attached as **Exhibits A and B**. Thus, the military did more than just review and approve the final design, it had direct involvement in the development of the design.

24. The U.S. military had a permanent office at the Pratt & Whitney East Hartford campus, dating back to the 1930's. U.S. military engineers and inspectors were present at Pratt & Whitney facilities to oversee, inspect, and approve the work performed by Pratt & Whitney engineers and other personnel, including approval of any changes to engine design or specifications on all aircraft engines supplied to the military. These representatives had different areas of specialty, such as engineering, contracts, and quality control. During the period of my employment at Pratt & Whitney, these U.S. military specialists at Pratt & Whitney controlled the design requirements and manufacturing requirements of any aircraft engine produced at Pratt & Whitney for the military.

25. On-site U.S. military inspectors were empowered to test component parts and the finished assembly and accept or reject any non-conforming units. This qualification testing was also governed by detailed Military Specifications. Attached hereto as **Exhibit F** is a true and correct copy of specification MIL-E-5009B, which sets forth the testing requirements for turbojet and turbofan aircraft engines such as the J57 and TF33.

26. After each engine or component test, Pratt & Whitney was required to submit a report to the military, which needed to be "certified by a Government representative as to the proper conduct of the tests" and which "constitute[d] the basis for approval of the individual tests." Section 3.1.1, p. 1 of **Exhibit F**. The military also required specific notation and documentation for any requests for approval of changes in components. Section 3.1.1.g.2. As set forth in Section 3.1.2, after each separate engine test the contractor was required to submit a detailed report that would "be used as a basis for qualification approval of the complete engine." Sections 4.2. and 4.3 of MIL-E-5009B illustrate the detail of military oversight of engine and engine component testing.

27. This testing often led to additional back-and-forth between the military and Pratt & Whitney, and specifically with respect to issues like the material composition of component parts. For example, correspondence arising from Air Force qualification testing of the J57 in 1953 reflects back-and-forth on numerous issues but notably includes approval of a request for a change in the material composition of fuel control O-Rings. A true and correct copy of that correspondence from the Air Force Aeronautical Equipment Branch to Pratt & Whitney is attached hereto as **Exhibit G**. The discussion related to O-Rings is at Item 7d on RTX-HOFF 002286.

28. If at any point, any material, feature, or component of the engine failed to comply with the applicable military and contract specifications, or performance requirements, it would have been rejected by the military. The military's acceptance of an engine signified that it had been manufactured in accordance with all of the requirements of the contract and related specifications. Any aircraft engine designed and manufactured by Pratt & Whitney for the military that did not meet the military's standards and specifications for that particular engine was rejected.

29. Any written materials, such as warnings or product manuals, that accompanied the engines built by Pratt & Whitney for the military were similarly controlled and approved by

military representatives. Pursuant to the requirements laid out in military specifications AN-H-7, MIL-H-5473, and MIL-H-5474, Pratt & Whitney prepared draft maintenance and overhaul manuals and parts catalogs, also known as Illustrated Parts Breakdowns, for the engines it supplied to the Air Force and submitted these drafts of the manuals and catalogs to the military for review, validation, and verification. The manuals and catalogs were not approved for publication until the military had completed its review and editing of the documents. The military reviewed these written materials and considered and approved what warnings should be provided with respect to military engines. True and correct copies of MIL-H-5473A and MIL-H-5474B are attached hereto as **Exhibits H and I**.

30. As further evidence of the control exerted by the United States Government over the production of technical manuals, the technical manuals related to Pratt & Whitney military aviation engines are owned by and published under the authority of the United States government and require government permission to disclose or distribute. Generally, the face page of the manual makes this clear with a statement that the manual is published under the authority of the controlling branch of the military for that engine (usually either the U.S. Air Force or the U.S. Navy) and states that distribution of the document is restricted to the Department of Defense and "DOD" contractors. All other requests for distribution are to be referred to the controlling branch of the military for that engine.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 22 day of November 2025.

By: [signature]
John C. Sumner