**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| RAYMOND A. HOFF and NANCY HOFF, Plaintiffs, | : | |
| v. | : | 3:24-CV-00206 (SFR) |
| AVCO CORPORATION, et al., Defendants. | : | |

**MEMORANDUM & ORDER**

Raymond Hoff ("Hoff") and his wife Nancy Hoff bring this action against RTX Corporation ("RTX"). Hoff alleges he was exposed to asbestos from engines manufactured by RTX's subsidiary, Pratt & Whitney, while he worked as engine mechanic in the Air Force, and this exposure was a substantial factor in causing his mesothelioma. Hoff alleges RTX failed to warn him of the dangers of its product in violation of Connecticut tort law.

RTX moves for summary judgment on two grounds: (1) the government contractor defense grants it immunity from Plaintiffs' claims and (2) Plaintiffs have failed to establish causation. In connection with its summary judgment motion, RTX seeks to prelude the expert testimony of four of Hoff's experts: Theodore Cecchini and Drs. Michael Ellenbecker, Brent Staggs, and Gerald Markowitz. For the reasons set forth below, I deny RTX's motion for summary judgment with respect to the government contractor defense and deny RTX's motion to preclude the expert testimony of Dr. Ellenbecker. Regarding Dr. Staggs's testimony, I will hold a *Daubert* hearing. I deny RTX's motion for summary judgment on causation and will determine following the *Daubert* hearing if the motion may be renewed. As Plaintiffs do not rely on the testimony of Dr. Markowitz to oppose summary judgment, I deny without prejudice

to renewal in advance of trial RTX's motion to preclude Dr. Markowitz's testimony. I grant in part and deny in part without prejudice RTX's motion to preclude the testimony of Cecchini.

# I. BACKGROUND

## A. Factual Background[1]

### 1. Hoff's Work History with Pratt & Whitney Products

Hoff enlisted in the Air Force in June 1969. Hoff Dep., ECF No. 343-3, at 4. After six weeks of basic training at Lackland Air Force Base ("AFB") in San Antonio, Texas, Hoff received specialized training at "jet engine school," which occurred at Chanute AFB in Rantoul, Illinois. *Id.* at 5-6. Hoff participated in jet engine school from July to October 1969, during which time Hoff tore down and reconstructed J57 jet engines manufactured and sold by Pratt & Whitney.[2] *Id.* at 7, 9.

In October 1969, following jet engine school, Hoff was stationed at Shaw AFB in South Carolina. *Id.* at 8. At Shaw, Hoff constructed and deconstructed jet engines in his capacity as a jet engine mechanic. Hoff was a member of various crews, working on two specific engines: Pratt & Whitney's J57, and the J79 jet engine manufactured by General Electric. *Id.* at 8-9.

Hoff moved in January 1972 from Shaw AFB to Sheppard AFB, located near Wichita Falls, Texas, for an eight-week familiarization course for the T53 helicopter engine manufactured by Lycoming. *See* Hoff Dep., ECF No. 316-2, at 15-16; Pl.'s 56(a)2 St. ¶ 2. Hoff

[1] The factual background is drawn primarily from facts in Plaintiffs' Rule 56(a)2 Statement of Facts, ECF No. 343, Defendant's 56(a)1 Statement of Facts, ECF No. 316, and various exhibits attached to these Statements. Citations to the Rule 56(a)1 and 56(a)2 Statements are by paragraph number. With respect to most other documents, page citations are to the page number generated by the ECF system.

[2] I will generally refer to Defendant RTX Corporation as "RTX." Where I refer to the engines on which Hoff worked, I will refer instead to Pratt & Whitney, which manufactured those products.

was deployed to Thailand and Vietnam from March 1972 to February 1973, where he performed maintenance work on T53 engines. Hoff Dep., ECF No. 316-2, at 17. After returning to the United States from Asia, Hoff was again stationed at Chanute AFB from March 1973 to August 1974. Hoff Dep., ECF No. 343-3, at 18. During this second stint at Chanute AFB, Hoff repaired J33 and J79 (manufactured by General Electric) and J57 jet engines (Pratt & Whitney). At Chanute AFB, Hoff's repaired jet engines whose parts jet engine school students had broken in the course of their hands-on training. *Id.* at 19, 22; Pl.'s 56(a)2 St. ¶ 3. Hoff also worked in the snack bar as a short order cook, specializing in cheeseburgers. Hoff Dep., ECF No. 343-3, at 20.

Hoff's next assignment was assembling and disassembling TF33 and J57 jet engines, both manufactured by Pratt & Whitney, at Castle AFB in California, where he served from August 1974 to November 1980. *Id.* at 23-24.[3] The remainder of Hoff's Air Force career, from December 1980 to November 1993, took place at Dover AFB in Delaware, where Hoff did not work on Pratt & Whitney engines. Pl.'s 56(a)2 St. ¶ 2; Hoff Aff., ECF No. 306-6, at 1.

Hoff returned to Dover AFB as a civilian employee from 1996 to 2008. As with his time at Dover AFB while an airman, there is no indication in the record that Hoff came into contact with Pratt & Whitney engines at Dover AFB as a civilian.

### 2. Hoff's Exposure to Asbestos from Pratt & Whitney Products

Hoff's work as a jet engine mechanic involved tearing down and reconstructing Pratt & Whtiney's J57 and TF33 engines, which he has described in detail in his depositions. RTX

[3] While this section of the deposition transcript names the engine as the "T-33," other portions of the record indicate that the engine in question is actually Pratt & Whitney's TF33. *See* Hoff Dep., ECF No. 343-4, at 37, 39-42. The parties' Statements of Facts also reference the TF33 engine. Pl.'s 56(a)2 St. ¶ 5.

expert witness John Sumner acknowledges that those specific engines had asbestos-containing parts during the years that Hoff was responsible for maintaining them for the Air Force. Sumner Dep., ECF No. 343-5, at 6. Sumner further notes that the U.S. military approved Pratt & Whitney's use of asbestos-containing components in its jet engines and indeed sometimes required it. Sumner Decl. ¶¶ 15, 18, ECF No. 316-4.

In the record is an "Asbestos Parts List" for Pratt & Whitney's J57 and TF33 engines. The document, provided by RTX, lists each of the specific parts in those jet engines that is known to have contained asbestos. The list contains different variations for the J57 engine, which powered at least four models of turbojet, each with a different J57 specification. Every variation of the J57 and TF33 engines had at least 44 parts containing asbestos, including various gaskets, grommets, clamps, and fuel manifolds. ECF No. 349 at 2-4, 5-6.[4] Sumner confirms that the J57 and TF33 engines contained gaskets and clamps containing asbestos. *See* Sumner Decl. ¶ 8, ECF No. 316-4.

Hoff named gaskets, clamps, fire sleeves, vapor barriers, and insulation as parts that he associated with his work on Pratt & Whitney engines. Pl.'s 56(a)2 St. ¶ 6. Hoff handled gaskets and clamps in the J57 and TF33 engines that were manufactured by Pratt & Whitney. *See id.* ¶ 17; Sumner Decl. ¶ 8.

Hoff explained that, while he was a member of a J57 engine crew at Shaw AFB, the crew normally would repair one engine across a period of 30 to 45 days. He said:

[4] The Asbestos Parts List lists parts by "Part No." Without a schematic of each engine, I cannot determine whether one or multiple of each kind of part, identified by Part No., was used in the particular engine specification. I need not resolve that question here. For purposes of resolving the motions before me, it is undisputed that every variation of the J57 and TF33 engines had at least 44 parts containing asbestos.

> We would – there's various things you would do during the repair phase. First, you would inspect the motor to see what external components that were damaged or broken that needed replaced. You'd also start the disassembly and you would disassemble it to the point of the repair needed. And then you would start the reassemble of the engine. After the engine was built up you would send it to test cell where it was test run to make sure it met all of the parameters required for the aircraft. And then you would bring it back to the shop and finish any minor maintenance that was still required before it was turned serviceable and put into the spare line.

Hoff Dep., ECF No. 343-3, at 10-11. Hoff worked on the J57 engine "every day" during his training at Chanute and "every day of [his] career" during his first three years in the Air Force, including while at Shaw. Hoff Dep., ECF No. 343-4, at 17, 18. He agreed that, over that time period, he had "handled and inspected every single portion . . . every piece, nook, and cranny of th[e] J57 engine." *Id.* at 17-19. When engines were catastrophically damaged, Hoff's team would "disassemble the engine down to the smallest part," taking off and reinstalling every single engine component apart from the data plate containing the serial number of the motor. *Id.* at 20.

As part of the J57 engine tear down process, Hoff would remove Pratt & Whitney gaskets from the engine. He recalled that the gaskets were

> fibrous gaskets that you would – when you separated the flange the gaskets would usually stick to the flanges, and then you would have to scrape the flanges off with either a putty knife or a razor blade to get the flanges clean to where when you reassembled that you put the new gasket on and they would seal properly.

*Id.* at 20-21. Removing fibrous gaskets was a task that Hoff performed commonly, and he would at times remove multiple fibrous gaskets from one engine. *Id.* at 21. The gaskets would break apart upon removal:

> I would say that they – they were – all of them would break apart of some kind. Very few came off as a whole assembly. None – none of them really came off as a whole assembly. Some came out as a larger part, but most of them would

> break up into small portions that you would have to clean off of either flange that you were working with.

*Id.* at 21-22. When the gaskets broke apart during engine disassembly, they released fibrous material that would get on Hoff's hands and clothing, and that he would breathe in. *Id.* at 22.[5]

Hoff also had to remove clamps during J57 engine disassembly. Tearing down the engine required Hoff to remove numerous clamps "all over the J57 on all ducting, tubing, oil lines, fuel lines, hydraulic lines, electrical lines." *Id.* at 23. Every time Hoff removed a clamp—which would have been in "deteriorate[d]" and "fray[ed]" condition from engine use—the clamp would release fibrous material that would get on Hoff's hands and clothing, and that he would breathe in. *Id.* at 23-25.

While at Castle AFB for six years, Hoff performed the same work on J57 engines as he did at Shaw, including removing gaskets, clamps, and insulation blankets. *Id.*at 38-39. Hoff's assignment at Castle also involved the tear down and build up of TF33 engines, from which he removed fibrous gaskets and clamps in the same manner as he did from J57 engines. *Id.* at 41-42.

As part of the engine tear-down process, Hoff would sometimes remove the Quick Engine Change ("QEC") kit connecting the engine to an airframe. Pl.'s 56(a)2 St. ¶ 7; Sumner

---

[5] When asked directly about his exposure to asbestos while working with J57 engines, Hoff replied that "[t]here was clamps on the engine that were classified as asbestos clamps." Hoff Dep., ECF No. 343-3, at 12. The clamps, which Hoff recalled as being manufactured by Adel and being told by his crew chief were asbestos-containing, generated dust when spread apart during the removal process. *Id.* at 13-16. Hoff further pointed to the "insulation on the vapor barrier," which he didn't "know exactly what it was, but it could have been asbestos in it because it was in the hot section of the motor." *Id.* at 12. Finally, Hoff identified insulation blankets, insulation on the outside of hydraulic tubing and hoses, and seals as other asbestos-containing materials in J57 and J79 engines. *Id.* at 16. When questioned, however, Hoff admitted to not having any personal knowledge of the material composition of the seal, gaskets, or insulation material and blankets that he handled. Hoff Dep., ECF No. 316-2, at 22-23.

Decl. ¶ 11. QEC kits contain various components, including gaskets, clamps, hydraulic pumps, generators, and insulation blankets. Pl.'s 56(a)2 St. ¶ 7.[6] Pratt & Whitney did not manufacture QEC kits. *Id.* ¶¶ 8-9. [7] The parties disagree regarding the extent to which Pratt & Whitney is responsible for asbestos exposure to Hoff from the QEC kits. *Id.* ¶ 8. RTX relies on Sumner's statement that Pratt & Whitney "played no role in designing" QEC kit components, nor "control[led], specif[ied], or direct[ed] that asbestos be used in any of these parts." Sumner Decl. ¶ 12. Plaintiffs, on the other hand, point to Sumner's statement that the QEC kits were designed with an "unbelievable amount of interaction" and a "lot of consultation" with Pratt & Whitney. Sumner Dep., ECF No. 343-5, at 12, 13.[8]

### B. Procedural History

Plaintiffs filed the underlying Complaint in this action in state court on January 18, 2024. ECF No. 1, at 1. Defendants removed the state action to this court on February 15, 2024 pursuant to 28 U.S.C. § 1442, and amended Notices of Removal were filed on February 16 and 22, 2024. ECF Nos. 1, 4.[9]

---

[6] According to Hoff, the clamps on the QEC kit "could have been" asbestos-containing clamps. Hoff Dep., ECF No. 343-4, at 34.

[7] Plaintiffs do not deny that the QEC kits were not manufactured by Pratt & Whitney, but Plaintiffs allege that "Pratt & Whitney engineers worked closely with the airframe engineers to design and specify exactly what parts were needed for the QEC Kit." Pl.'s 56(a)2 St. ¶¶ 8-9.

[8] Evidence in the record suggests Hoff had other asbestos exposures before and during his time in the Air Force. The extent of that exposure is not relevant to the matters resolved in this Opinion and thus I do not detail it here.

[9] This case was initially assigned to the Honorable Alvin W. Thompson. It was transferred to the Honorable Omar A. Williams on March 11, 2024, and then transferred to me on January 6, 2025. Plaintiffs brought this action against multiple defendants, and have settled their claims against all Defendants other than RTX.

On November 24, 2025, RTX filed the instant Motion for Summary Judgment and the accompanying Memorandum ("Def.'s Mem.") and 56(a)1 Statement of Material Facts ("Def.'s 56(a)1 St."). ECF Nos. 314-16. RTX simultaneously filed four motions to preclude testimony and accompanying memoranda, seeking to preclude four of Plaintiffs' experts: Dr. Gerald Markowitz (ECF Nos. 303-04), Dr. Brent Staggs (ECF Nos. 305-06), Dr. Michael Ellenbecker (ECF Nos. 307-08), and Theodore Cecchini (ECF Nos. 309-10).

On December 22, 2025, Plaintiffs filed a Response to the motion for summary judgment ("Pls.' Mem."), ECF No. 341, a 56(a)2 Statement of Material Fact ("Pls.' 56(a)2 St."), ECF No. 343, and responses to the motions to preclude testimony, ECF Nos. 339 (Dr. Ellenbecker), 342 (Dr. Staggs), 344 (Cecchini), 347 (Dr. Markowitz). On January 12, 2026, RTX filed replies to each of the Plaintiffs' responses. ECF Nos. 361-65.

On August 13, 2026, the Court held oral argument on these motions.

## II. LEGAL STANDARD

### A. Summary Judgment

The Court will grant a motion for summary judgment if the record shows "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The nonmoving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48. The moving party may satisfy this

burden by pointing out to the district court an absence of evidence to support the nonmoving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation modified). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.*

When deciding a motion for summary judgment, the Court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier v. Armstrong*, 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007). In reviewing the record, the Court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in [her] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the nonmoving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## III. DISCUSSION

RTX argues it is entitled to summary judgment on two independent grounds. First, RTX asserts that the government contractor defense grants it immunity from Plaintiffs' claims. Second, RTX argues that Plaintiffs have failed to establish causation, a necessary component of Plaintiffs' claims. RTX argues that summary judgment is warranted because the inferences necessary for Plaintiffs' claims must be proved through expert testimony, and the experts Plaintiffs offer must be precluded under Federal Rule of Evidence 702.

I will first address RTX's argument about the government contractor defense. Next, I will turn to RTX's arguments about causation. I will review the applicable standard for causation and address RTX's motions to preclude Plaintiffs' causation witnesses, Drs. Ellenbecker and Staggs. Finally, I will turn to RTX's remaining arguments about Plaintiffs' failure to prove causation.

### A. Government Contractor Defense

RTX argues that the government contractor defense, a federal common law doctrine that protects certain contractors manufacturing and supplying equipment to the military from suit, entirely bars Plaintiffs' lawsuit. Plaintiffs respond that RTX cannot establish that there is no genuine issue of material fact with respect to the applicability of the government contractor defense to Plaintiffs' failure-to-warn claim. Drawing all inferences and resolving all disputed facts in Plaintiffs' favor, I conclude that RTX has not established the government contractor defense as a matter of law, and deny summary judgment on that ground. Because Plaintiffs do not need to rely on the testimony of their expert Dr. Gerald Markowitz to defeat summary judgment on the government contractor defense, RTX's motion to preclude Dr. Markowitz's

testimony, ECF No. 303, is denied without prejudice to renewal in advance of trial.[10] *See Doe No. 1 v. Putnam Cnty*., No. 16-cv-8191 (PMH), 2020 WL 7027596, at *9 (S.D.N.Y. Nov. 30, 2020) ("[W]here a court determines that consideration of an expert's testimony in support of or opposition to a motion for summary judgment is unnecessary to the determination of the summary judgment motion itself, it may deny the motion to preclude without prejudice.").

### 1. Legal Standard for the Government Contractor Defense in Failure-to-Warn Cases

RTX maintains that summary judgment is warranted under the government contractor defense first recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). In *Boyle*, the plaintiff's estate pursued a design-defect tort claim against the civilian manufacturer of a military helicopter, alleging that the manufacturer's faulty design caused the death of the plaintiff. Reasoning that military contractors are often bound by the government's precise specifications, which themselves represent significant policy judgment implicating uniquely federal interests, the Supreme Court held that federal common law bars certain state law claims against government contractors. Defendants may raise such a defense, however, only when a "significant conflict exists between an identifiable federal policy or interest and the operation of state law." *Id.* at 507 (citation modified).[11]

---

[10] At oral argument, Plaintiffs confirmed that they were not relying on Dr. Markowitz's testimony in connection with their opposition to summary judgment.

[11] *Boyle* held: "Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

Although *Boyle* arose in the context of a design-defect action, the Second Circuit has since applied the government contractor defense to state law failure-to-warn claims. *See, e.g.*, *Cuomo v. Crane Co.*, 771 F.3d 113 (2d Cir. 2014); *Densberger v. United Techs. Corp.*, 297 F.3d 66 (2d Cir. 2002); *In re Joint E. & S. Dist. N.Y. Asbestos Litig.* (*Grispo v. Eagle Picher Indus., Inc.*), 897 F.2d 626 (2d Cir. 1990). Just as in *Boyle*, however, where no genuine "conflict exists between requirements imposed under a federal contract and a state law duty to warn," federal common law presents no obstacle to state claims. *Grispo*, 897 F.2d at 631.

In the failure-to-warn setting, the party raising the government contractor defense must show "(1) government control over the nature of product warnings; (2) compliance with the Government's directions; and (3) communication to the Government of all product dangers known to it but not to the Government." *Densberger*, 297 F.3d at 75 n.11 (citation modified); *see also Donohue v. CBS Corp.*, No. 17-cv-7232, 2017 WL 5713222, at *2 (S.D.N.Y. Nov. 27, 2017); *Allen v. Gen. Elec. Co.*, No. 3:09-cv-0497 (JCH), 2009 WL 2766583, at *3 (D. Conn. Aug. 27, 2009).

Here, I focus on the first prong of the *Densberger* test: government control over warnings. *Densberger* explained that satisfying this prong requires a contractor to show that "the Government itself dictated the content of the warnings meant to accompany the product and . . . controlled or limited the ability of contractors themselves to warn those who would come into contact with its product." *Densberger*, 297 F.3d at 76 (citation modified). As the Second Circuit stated in *Cuomo*, government dictation of warnings "does not necessarily require the government to prescribe [the] literal terms" of any associated warnings. *Cuomo*, 771 F.3d at 117. Rather, a defendant need only establish that the Government "dictated *or otherwise controlled* the nature and the content of the product warnings." *Id.* (citation

modified).[12] Regardless of the precise nature of government control, however, a defendant must nonetheless establish that the government implemented some sort of "discretionary safety policy . . . effectively 'limiting' [the contractor's] ability to affix additional asbestos warnings." *Id.* In other words, the government does not exercise its discretion when it passively accepts manufacturer-provided manuals and warnings. The government must take an active role in editing, restricting, or approving the specific content of product warnings for the first prong of the government contractor defense to be satisfied. *See Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 125 (2d Cir. 2021) ("Stripped to its essentials, the military contractor's defense under *Boyle* is to claim, 'The Government made me do it.'") (citation modified).[13]

[12] *Cuomo* said further that this "standard [can be] satisfied by evidence showing that the Government, making a discretionary decision contrary to the requirements of state law, incorporated this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion." *Cuomo*, 771 F.3d at 117 (citation modified). Consistent with *Cuomo*, district courts in the First Circuit have held that back-and-forth negotiation between the government and a contractor over the content of the warnings—where the government does not literally dictate the precise wording of the warnings but clearly exercises editorial discretion and a veto power—may permit a defendant to establish the government contractor defense. *See, e.g.*, *Hilbert v. McDonnel Douglas Corp.*, 529 F. Supp. 2d 187, 199 (D. Mass. 2008); *Sebright v. Gen. Elec. Co.*, 525 F. Supp. 3d 217, 252 (D. Mass. 2021) (stating that "government officials ultimately must remain the agents of decision" and "[a] showing that the government had general control over the project is insufficient, as is mere rubber-stamping of a contractor's decision") (citation modified).

[13] RTX relies on two out-of-circuit cases for its suggestion that the relevant inquiry is "government discretion and approval over warnings, not express prohibition." Def. Mem. 32 n.9; *see Getz v. Boeing Co.*, 654 F.3d 852 (9th Cir. 2011); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992 (7th Cir. 1996). As explained above, however, establishing government discretion in the Second Circuit demands a showing that the government controlled or limited the ability of the contractor to provide its own warnings. *See Badilla*, 8 F.4th at 125 (2d Cir. 2021) ("We have [] limited contractor liability only where the government mandated the action that violated state law."); *Allen v. Gen. Elec. Co.*, No. 3:09-cv-372 (CFD), 2010 WL 918305, at *5 (D. Conn. Mar. 9, 2010) ("[D]efendants must show that the government controlled which warnings the defendants were allowed to provide and thereby precluded the warnings at issue from being given.") (citation modified); *cf. Hilbert*, 529 F. Supp. 2d at 199 (stating that "[i]f the government was silent as to whether or not the contractors were permitted to warn, or there was no discussion about the content

As the party moving for summary judgment on a defense for which it bears the burden of proof, RTX must do more than "ensure the existence of some competent evidence supporting a 'colorable' federal defense," as is the standard for removal. *Cuomo*, 771 F.3d at 117 (considering government contractor defense in the context of a motion to remand); *Leite v. Crane Co.*, 749 F.3d 1117, 1124 (9th Cir. 2014). RTX must instead demonstrate based on undisputed facts, with all inferences drawn in favor of Plaintiffs, that the government actively controlled the content of the warnings meant to accompany the J57 and TF33 engines by using its discretion to "limit[] [RTX's] ability to affix additional asbestos warnings" to those engines. *Cuomo*, 771 F.3d at 117 (citation modified); *see also Sebright v. General Electric Co.*, 525 F. Supp. 3d. 217, 252 (D. Mass. 2021) ("Since GE is moving for summary judgment on an affirmative defense upon which it bears the burden of proof at trial, it must demonstrate the absence of a genuine issue of material fact as to all three (3) prongs of the *Boyle* test.") (citation modified).

**2. Application to the Evidence Presented by RTX**

RTX argues that the military prevented Pratt & Whitney from warning Hoff of any asbestos-related dangers by "control[ing] the content of all written materials accompanying

---

of the warnings" and "no federal policy is infringed . . . then the affirmative federal contractor defense must fail").

The Second Circuit's standard accords with *Boyle*'s reasoning that ordering from "stock" is insufficient to establish government discretion in design-defect cases. *See Boyle*, 487 U.S. at 509 ("If, for example, a federal procurement officer orders, by model number, a quantity of stock helicopters that happen to be equipped with escape hatches opening outward, it is impossible to say that the Government has a significant interest in that particular feature."); *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 90 (2d Cir. 2008) ("Where the government merely rubber stamps a design, or where the government merely orders a product from stock without a significant interest in the alleged design defect, the government has not made a discretionary decision in need of protection, and the defense is therefore inapplicable.") (citation modified).

Pratt & Whitney engines, including any caution statements or warnings in technical manuals and related documentation." Def.'s Mem. 32. In support of this assertion, RTX relies on the statement of its expert John Sumner, who states in his declaration that

> Pratt & Whitney prepared draft maintenance and overhaul manuals and parts catalogs . . . for the engines it supplied to the Air Force and submitted these drafts of the manuals and catalogs to the military for review, validation, and verification. The manuals and catalogs were not approved for publication until the military had completed its review and editing of the documents. The military reviewed these written materials and considered and approved what warnings should be provided with respect to military engines.

Sumner Decl. ¶ 29. Sumner notes that the while Pratt & Whitney prepared draft materials, the United States government actually owned, published, and distributed the technical manuals. *Id.* ¶ 30. Plaintiffs respond that no evidence in the record shows that the government exercised control over the content of the technical manuals, including prohibiting Pratt & Whitney from including warnings about asbestos. Pls.' Mem. 24-25.

Sumner does not possess first-hand knowledge of the process by which the military "review[ed], validat[ed], and verifi[ed]" any warnings, or of any discussions between Pratt & Whitney and the military regarding the content of any warnings that would appear in the manuals. Instead, he bases his declaration on his review of historical records, which he conducted as a consultant for Pratt & Whitney. Sumner Decl. ¶¶ 2-3. Regardless, Sumner's declaration avers the mere fact of government review of and approval over manuals, from which I cannot, without further evidence, conclude that the government actually prevented Pratt & Whitney from warning about asbestos in its engines.

RTX submits MIL-H-5473A, a military specification covering the requirements governing the composition and contents of handbooks and maintenance instruction manuals for aircraft, dated August 17, 1950, ECF No. 316-4, at 156-91; MIL-M-5474B, a draft military

specification containing the general requirements for the preparation of technical manuals, dated November 19, 1956, *id.* at 193-262; and AN-H-7, an Army-Navy aeronautical specification supplying the requirements for the preparation of handbooks and catalogs for aircraft, engine, and accessories, *id.* at 263-338.[14]

MIL-H-5473A sets out "REQUIREMENTS" for textual content and illustrations that must be included in manuals and the style of such content, as well as specific information not to be included in manuals. *Id.* at 157-58. Yet I see no provision in that specification mandating excision of health-related warnings from manuals.

Both MIL-M-5474B and AN-H-7a contemplate that manuals will contain notes, cautions, and warnings, including those relating to health hazards. *Id.* at 204, 301, 304. MIL-M-5474B differentiates between "CAUTION" and "WARNING" labels, with the former, smaller label used to indicate operating procedures and practices detrimental to equipment and the latter, larger label reserved for operating procedures and practices that could result in personal injury or death. *Id.* at 204. MIL-M-5474B explicitly instructs: "When hazardous chemicals or adverse health factors in the environment or use of the equipment cannot be eliminated, appropriate precautionary requirements shall be included. Necessary personnel protective devices shall be indicated." *Id.* RTX points to these manuals as evidence that the government controlled warnings. However, one might reasonably conclude these manuals place no restrictions on a manufacturer's ability to determine the content of warnings and are instead concerned with "the form of warnings, not their content, even if they must eventually

[14] RTX has submitted AN-H-7, dated October 21, 1942, ECF No. 316-4, at 322-38; AN-H-7a, which superseded AN-H-7 on January 29, 1944, *id.* at 298-321; and AN-H-7b, collecting amendments to AN-H-7a, with the latest dated May 2, 1947, *id.* at 263-97.

be approved by the government." *Hilbert v. McDonnel Douglas Corp.*, 529 F. Supp. 2d 187, 199, 201 (D. Mass. 2008).

Of course, the silence in the military specifications does not negate the possibility that the government did in fact forbid asbestos warnings. But RTX presents no evidence that Pratt & Whitney considered the possibility of adding asbestos-related warnings, or drafted and attempted to include such warnings in its manuals, and the military prevented it from doing so. Nor does RTX provide any contractual language, regulations, or other documentary evidence that bears on whether government requirements conflicted with Pratt & Whitney's ability to comply with state tort law. Instead, RTX suggests that responsibility passes fully to the government because the government had the final authority to sign off on warnings contained within manuals.

Although RTX does not necessarily need to produce the specific contracts at hand, it does need to provide evidence that the government "precluded the warnings at issue from being given," which it has failed to do. *Allen v. Gen. Elec. Co.*, No. 3:09-cv-372 (CFD), 2010 WL 918305, at *5 (D. Conn. Mar. 9, 2010) (quoting *Densberger*, 297 F.3d at 75). At this stage of the case, all inferences must be drawn in Plaintiffs' favor. Because RTX has not demonstrated based on undisputed facts a conflict between its contracting requirements and Pratt & Whitney's duty to warn under state law, I deny the motion for summary judgment on the basis of the government contractor defense.

**B. Causation**

RTX advances a second argument for why summary judgment is appropriate: Plaintiffs have failed to point to sufficient admissible evidence in the record from which a jury could reasonably conclude that Pratt & Whitney products were a substantial factor in causing Hoff's

mesothelioma. RTX argues that Plaintiffs' experts offer unreliable testimony that should be precluded under Rule 702. RTX further argues that Plaintiffs' experts fail to establish that Hoff was exposed to respirable asbestos from Pratt & Whitney components in quantities sufficient to cause mesothelioma. Before addressing the admissibility of Plaintiffs' experts, I first review the causation standard.

Plaintiffs and RTX agree that Connecticut law governs, and that for Plaintiffs to prevail at trial on their failure-to-warn claim they must show that Pratt & Whitney's products were a substantial factor in bringing about Hoff's mesothelioma. *See Haesche v. Kissner*, 229 Conn. 213, 218-19 (1994) (explaining that a plaintiff must show that the alleged failure-to-warn was the proximate cause of her injuries); *Ruiz v. Victory Props., LLC*, 315 Conn. 320, 329 (2015) ("The test for proximate cause is whether the defendant's conduct was a substantial factor in producing the plaintiff's injury.") (quoting *Label Systems Corp. v. Aghamohammadi*, 270 Conn. 291, 321 (2004)); *In re Mirena IUD Prods. Liab. Litig*., 713 F. App'x 11, 15 (2d Cir. 2017) ("[S]tate law controls on the question of what evidence is necessary to prove an element of a state law claim, such as [] causation.").

Plaintiffs' causal chain connecting Pratt & Whitney to Hoff's mesothelioma is as follows: (1) Hoff's work as a jet engine mechanic exposed him to dust from Pratt & Whitney engine components; (2) the dust emitted from Pratt & Whitney engines contained or otherwise proves the existence of respirable asbestos; and (3) Hoff's exposure to the respirable asbestos from Pratt & Whitney engines was a "substantial contributing cause" of Hoff's mesothelioma. Pls.' Mem. 5.

To support causation, Plaintiffs rely on the proposed expert testimony of Theodore Cecchini and Drs. Michael Ellenbecker and Brent Staggs.

Cecchini served as an Aircraft Maintenance Specialist and Aircraft Crew Chief in the Air Force from 1976-1980 and in the Air National Guard from 1982-1988. Cecchini Expert Report, ECF No. 310-1, at 1. In his Expert Report, Cecchini states that he expects his "testimony will include issues relating to the design, manufacture, procurement, production, and maintenance of military aircraft." *Id.* RTX objects to the admissibility of any testimony by Cecchini on "Hoff's asbestos exposure, dust inhalation, or the creation and dispersion of airborne fibers"; "government procurement/contracting, engine design, QEC specifications, and manufacturer knowledge"; "authorship, content, and warnings in TOs [technical orders] and maintenance manuals"; and which components of J57 and TF33 engines contained asbestos. ECF No. 310, at 6-10. RTX agrees, however, that Cecchini should be permitted to assist the jury by giving "limited background testimony about Air Force maintenance practices" based on his professional experience as to those practices. ECF No. 361, at 8.

At oral argument, Plaintiffs represented that Cecchini's testimony would describe to the jury what day-to-day work experience as a jet engine mechanic involved, and Cecchini would not offer any opinions on whether the engine components Hoff handled contained asbestos or produced respirable asbestos. I therefore grant RTX's motion to preclude Cecchini's testimony as to the asbestos content of engine components and Hoff's exposure to respirable asbestos. Because Plaintiffs do not need the remainder of Cecchini's testimony to defeat summary judgment on causation or the government contractor defense, I need not otherwise resolve RTX's motion to preclude Cecchini's testimony at this stage of the case. I thus deny without prejudice to renewal in advance of trial the remainder of the motion to preclude.

Plaintiffs rely on the testimony of Dr. Ellenbecker, an industrial hygienist, for the proposition that Hoff was exposed to respirable asbestos during his work as a jet engine mechanic; and the testimony of Dr. Staggs, a pathologist, to show that Hoff's work with Pratt & Whitney engines was a substantial factor in causing his mesothelioma. For the reasons discussed below, I conclude that Dr. Ellenbecker is qualified to offer expert testimony regarding the emission of respirable asbestos, and accordingly deny RTX's motion to preclude Dr. Ellenbecker's testimony. I intend to resolve RTX's motion to preclude Dr. Staggs's testimony after I hold a *Daubert* hearing to determine whether and on what basis Dr. Staggs will testify to whether Pratt & Whitney engines specifically were a significant factor in causing Hoff's mesothelioma. I deny without prejudice RTX's motion for summary judgment, which RTX may be permitted to renew depending on the outcome of the *Daubert* hearing on Dr. Staggs's testimony.

**1. Legal Standard for Admitting Expert Testimony**

RTX seeks to preclude the testimony of each of Drs. Ellenbecker and Staggs as unreliable under Rule 702 of the Federal Rules of Evidence ("Rule 702"), or in the alternative, as prejudicial under Rule 403 of the Federal Rules of Evidence ("Rule 403"). Fed R. Evid. 702, 403.

Federal Rule of Evidence 702 provides that

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Under Federal Rule of Evidence 702, for expert testimony to be admissible, the proponent must demonstrate by a preponderance of the evidence that the testimony is relevant and reliable." *Colwell v. Sig Sauer, Inc.*, 177 F.4th 382, 389 (2d Cir. 2026).

Evidence is relevant if the testimony "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Amorgianos v. Amtrak Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (citation modified). If expert testimony is relevant, the trial court must then determine "whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered" by the trier of fact. *Id.* (citation modified).

"In deciding whether an expert's analysis is reliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Rutledge v. Walgreen Co.*, 182 F.4th 168, 184 (2d Cir. 2026) (quoting *Amorgianos*, 303 F.3d at 267) (citation modified). Generally, where an expert reliably utilizes scientific methods to reach a conclusion, any asserted lack of support for these methods goes "to the weight, not the admissibility" of his or her testimony. *Amorgianos*, 303 F.3d at 267 (citation omitted). *See Rutledge*, 182 F.4th at 196 ("When an expert reliably applies a scientifically accepted methodology on an issue that is reasonably subject to debate, it is for the jury to decide the opinion's correctness."); *id.* at 193, 193 n.25 (explaining that a district court should preclude testimony "outside the boundaries of ordinary scientific discourse" but

not otherwise "adjudicate" methodical debates, and that "[t]his understanding is fully consistent with the 2023 amendments to Rule 702").[15]

Finally, "in addition to the requirements of Rule 702, expert testimony is subject to Rule 403, and may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Bustamante v. KIND, LLC*, 100 F.4th 419, 430 (2d Cir. 2024) (citation modified).

I now turn to RTX's arguments for the preclusion of the testimony for each of Drs. Ellenbecker and Staggs under Rules 702 and 403.

**2. Motion to Preclude Dr. Ellenbecker**

RTX seeks to preclude the expert testimony of Dr. Ellenbecker on the basis that Dr. Ellenbecker's opinions are unreliable and irrelevant because his underlying factual assumptions are unsupported, because his opinions do not "fit" the specific context of this case, and because he subscribes to an invalid theory of causation. Ellenbecker Preclusion Mem., ECF No. 308, at 2-3, 17.

**a. Dr. Ellenbecker's Report**

Dr. Ellenbecker is Professor Emeritus of Occupational and Environmental Hygiene at the University of Massachusetts Lowell. Ellenbecker Expert Report, ECF No. 308-1, at 1. Dr. Ellenbecker holds B.E.E. and M.S. degrees in electrical engineering; M.S. and Sc.D. degrees in environmental health sciences; and is professionally certified by the American Board of

[15] The 2023 amendments to Rule 702 were adopted in part to clarify that it is not that "arguments about the sufficiency's of an expert's basis always go to weight and not admissibility" but rather "once the court has found it more likely than not that the admissibility requirement has been met," *then* "any attack by the opponent will go only to the weight of the evidence." Fed. R. Evid. 702, Advisory Committee Notes, 2023 Amendments.

Industrial Hygiene. ECF No. 339-1, at 2-3. Dr. Ellenbecker prepared his expert report after reviewing the deposition testimony of Hoff and the expert report of Cecchini, as well as a letter from Plaintiffs' counsel. Ellenbecker Expert Report 2-3.

Dr. Ellenbecker's report examines each item of potential asbestos exposure described in Hoff's deposition testimony, including thermal insulation, gaskets, electrical components, friction products, drywall joint compound, roofing, and vinyl asbestos tile, and uses various studies on similar items to estimate a potential range of airborne asbestos exposure for each of those items. *Id.* at 27-32.

With respect to gaskets, for example, Dr. Ellenbecker states that the "general published literature [] indicates that a person removing and installing asbestos-containing gaskets produces elevated exposures to airborne asbestos." *Id.* at 28. He cites one study reporting that "short term exposures during dry removal of gaskets varied between 0.11 and 0.33 f/cc when surface cleaning was done with a scraper and/or with a wire brush," and another "measur[ing] exposures from 1.5 – 10 f/cm$^3$, with a TWA of 1.5 f/cm$^3$ during the scraping and hand wire brushing of small flanges; corresponding measurements for large flanges ranged from 9.3 – 24 f/cm$^3$ range with a time-weighted average of 3.6 f/cm$^3$." *Id.* (citation modified). Dr. Ellenbecker's report further references a study "evaluat[ing] asbestos exposures from gasket operations in the U.S. Navy as of 1978," which "measured airborne asbestos concentrations as high as 5.0 f/cm3 during machine punching, 3.0 f/cm$^3$ during hand punching, and 0.13 f/cm$^3$ during removal and hand scraping." *Id.*

Dr. Ellenbecker then relies on another study for the range of background asbestos concentration, which is $10^{-4}$ to $10^{-8}$ f/cm$^3$. *Id.* at 32. Comparing Hoff's estimated asbestos exposures to background, Dr. Ellenbecker states that it is his "scientific opinion that Mr. Hoff

had repeated, elevated exposures to airborne asbestos from" thermal insulation, clamps, gaskets, fire sleeves, hose assemblies, and wiring and cable while in the Air Force; and from automotive friction products, drywall joint compound, flooring, and roofing in his civilian life. *Id.* at 22. Dr. Ellenbecker concludes that "[t]hese sources caused Mr. Hoff to repeatedly inhale asbestos fibers, and each inhalation contributed to his risk of developing mesothelioma." *Id.* at 33.

**b. Dr. Ellenbecker's Role**

At the outset, it is important to note what role Dr. Ellenbecker's proposed testimony plays in this case. Dr. Ellenbecker is an industrial hygienist, not a pathologist. Dr. Ellenbecker is not opining on whether Hoff's exposure to Pratt & Whitney's products was a substantial factor in causing his mesothelioma. That is the role of Dr. Staggs, a pathologist. *See Pritt v. Air & Liquid Sys. Corp.*, No. 19-cv-10651 (KPF), 2022 WL 902684, at *8 (S.D.N.Y. Mar. 28, 2022 (observing that "Dr. Tsai is an industrial hygienist, not an epidemiologist or a pathologist" and the plaintiff "proffers Dr. Tsai's testimony to establish the evidentiary link between Plaintiff's own testimony regarding the tasks he performed and the equipment he encountered, and [the pathologist's] testimony establishing that the levels of asbestos exposure that Plaintiff encountered were a substantial factor in causing his mesothelioma") (citation modified).

Dr. Ellenbecker's proposed testimony addresses an "important link in the chain of causation" that the Connecticut Supreme Court found missing in *Bagley v. Adel Wiggins Grp.*, 327 Conn. 89 (2017). In *Bagley*, a worker in a helicopter blade shop brought a claim under the Connecticut Product Liability Act against a manufacturer of an adhesive product containing

asbestos (FM-37) that had been used in the shop. The Court held that the trial court should have granted the defendant's motion for a directed verdict. The Court reasoned:

> Although the plaintiff proved that breathing respirable asbestos fibers above ambient levels can cause mesothelioma, that FM-37 contained 8.6 percent asbestos and was sanded, producing dust, and that the decedent was exposed to that dust, both directly and secondarily, she nevertheless failed to establish that the dust from the FM-37 necessarily contained respirable asbestos fibers. Moreover, the question of whether respirable asbestos fibers are released by sanding a modified epoxy adhesive product with 8.6 percent asbestos, after it has been heated and cured, is a technical one whose answer is not within the common knowledge of lay jurors.

*Id.* at 104. The plaintiff was thus "required to prove [] with competent expert testimony" that "FM-37, when sanded, emitted respirable asbestos fibers that the decedent could have inhaled." *Id.* at 108. Although a pathologist had testified in the case, the Court observed that no witness "had done any testing or examination of FM-37 or a similar product to establish that respirable asbestos fibers are emitted when the product is sanded" and "there is no indication in the record that [the pathologist] possesses any specialized knowledge, from his familiarity with published studies or research or otherwise, about how modified epoxy adhesives containing asbestos behave when they are utilized as they were under the conditions in Sikorsky's blade shop." *Id.* at 109-10.

Here, Dr. Ellenbecker's proposed testimony addresses Hoff's exposure to respirable asbestos from his work on Pratt & Whitney engines. In resolving RTX's motion to preclude, I must determine whether Dr. Ellenbecker's proposed testimony is reliable, and not whether his testimony is or demonstrates what either party purports it to be or does—or even that it is correct. *Rutledge*, 182 F.4th at 193 n.25. I consider whether Dr. Ellenbecker's testimony provides insight into Hoff's exposure to respirable asbestos and whether that testimony results

from the application of ordinary scientific methods to a sufficient factual foundation. *See Pritt*, 2022 WL 902684, at *8.

**c. Dr. Ellenbecker's Underlying Factual Assumptions**

RTX's overarching complaint regarding Dr. Ellenbecker's factual foundation is that he does not distinguish between asbestos-containing engine components produced by Pratt & Whitney and asbestos-containing components produced by other manufacturers, and between asbestos-containing engine components and asbestos-free components. Therefore, RTX argues, Dr. Ellenbecker incorrectly attributes Hoff's exposure to parts that did not contain asbestos or which were not produced by Pratt & Whitney. Ellenbecker Preclusion Mem. 6-11.

Dr. Ellenbecker is not required to possess this specific knowledge for me to find his testimony admissible under Rule 702. "Experts generally are afforded latitude with respect to the data on which they rely and that challenges to reliability often present questions of weight, not admissibility." *Spectrum Dynamics Med. Ltd. v. GE Healthcare Techs., Inc.*, No. 18-cv-11386 (VSB) (KHP), 2026 WL 926689, at *14 (S.D.N.Y. Apr. 6, 2026). To be sure, I must "undertake a rigorous examination of the facts" on which Dr. Ellenbecker relies. *Rutledge*, 182 F.4th at 184; *see also In re Zimmer M/L Taper Hip Prosthesis Products Liability Litigation*, No. 18-MD-2859 (JMF), 2026 WL 2546501, at *2 n.1 (S.D.N.Y. Aug. 28, 2026) (stating that the 2023 amendments to Rule 702 "were intended to correct a line of cases in which courts had improperly treated the sufficiency of an expert's factual basis and the reliability of the expert's methodology as questions of weight for the jury, rather than as threshold questions of

admissibility for the court"). But expert opinions must only be based on "sufficient facts or data" to be admissible under Rule 702. *Spectrum*, 2026 WL 926689, at *14.[16]

Dr. Ellenbecker's report concludes that Hoff had "repeated, elevated exposures to airborne asbestos" from thermal insulation, clamps, gaskets, fire sleeves, hose assemblies, and wiring and cables from his work in the Air Force. Ellenbecker Expert Report 22. Dr. Ellenbecker bases his opinions on an analysis of Hoff's sworn testimony, which includes Hoff's descriptions of scraping and "wire brushing" gaskets to remove them from J57 and TF33 engines as well as Hoff's first-hand observation of visible dust during the removal process. Ellenbecker Expert Report 10; Ellenbecker Dep., ECF No. 339-3, at 25-26; *see* Hoff Dep., ECF No. 343-4, at 20-22. Dr. Ellenbecker then contextualizes Mr. Hoff's testimony by citing studies quantifying airborne asbestos exposures following the removal of asbestos gaskets "with a scraper and/or with a wire brush" in an industrial context, Ellenbecker Expert Report 28, and connects Hoff's testimony about his work history with the studies showing high levels of asbestos exposure from similar activities involving similar products. He subsequently draws the conclusion that Hoff had elevated levels of asbestos exposure from his work.

In critiquing Dr. Ellenbecker for not knowing which of those parts or components on the engines were supplied by Pratt & Whitney, including the fire sleeves, some gaskets and

---

[16] RTX cites to a number of cases in the Second Circuit for the proposition that an expert opinion must be rejected where such opinions are factually unsupported. Ellenbecker Preclusion Mem. 7 n.3. But the experts in these cases were precluded because their opinions entirely lacked evidence, or for other reasons that are not applicable to this case. *See, e.g.*, *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 91-92 (2d Cir. 2000) (upholding exclusion of expert by district court where district court concluded expert did not have enough information to posit a theory of causation as to a motorboat accident); *Kuzmech v. Werner Ladder Co.*, No. 3:10-cv-266 (VLB), 2012 WL 6093898, at *8-9 (D. Conn. Dec. 7, 2012) (excluding testimony in a products liability case where expert failed "to identify the engineering protocols or methods he employed to arrive at his conclusions").

clamps, heat shields and insulation, or vapor barriers mentioned in Hoff's deposition, RTX relies in large part on the statements of its expert witness John Sumner. Sumner states:

> The Pratt & Whitney J57 and TF33 engine models at issue contained several hundreds of parts, the vast majority of which were made of metal only. While some of the gaskets and cushioned loop clamps on the above Pratt & Whitney engines contained chrysotile asbestos encapsulated in a binding agent, such as Teflon, many of the gaskets and clamps used on the engines did not contain any asbestos. Further, most of the work activities associated with J57 and TF33 engines do not involve parts that contain asbestos.

Sumner Decl. ¶ 8.

With respect to other manufacturers, Sumner says that "Pratt & Whitney did not specify or supply any asbestos-containing blankets or asbestos-containing heat shields[,] . . . vapor barrier[,] . . . or any fire sleeves or insulated hydraulic tubes or hoses" in connection with the J57 or TF33 engines at issue, *id.* ¶ 9, and the QEC kits were not designed, manufactured, or supplied by Pratt & Whitney and that any fire sleeves, external insulation blankets, vapor barriers, or other QEC components were supplied and affixed to these engines by other actors, *id.* ¶ 12.

The Asbestos Parts List establishes that many parts in the J57 and TF33 engines, including gaskets, contained asbestos. And RTX has not disputed Hoff's testimony that he handled every part of the J57 and TF33 engines or his testimony that he regularly had to scrape off gaskets in the engines during the tear down process. Sumner's declaration therefore does not undermine the facts that form the basis of Dr. Ellenbecker's report.

Dr. Ellenbecker's analysis relies on evidence in the record, even if he, like all experts, has gaps in his knowledge of the record. RTX

> may, of course, attempt to undermine the [factual] bases for Dr. [Ellenbecker]'s opinions, such as by casting doubt on the reliability or accuracy of [Hoff]'s testimony. But Dr. [Ellenbecker]'s reliance on materials provided by

> [Plaintiffs'] counsel, or [his lack of] knowledge of the [engines'] equipment manufacturers, does not go to the reliability of [his] opinion, and thus is not a basis for the wholesale preclusion of [his] testimony.

*Pritt*, 2022 WL 902684, at *9 (citing *Phelps v. CBS Corp.*, No. 17-cv-8361 (AJN), 2020 WL 7028954, at *9 (S.D.N.Y. Nov. 30, 2020)); *see also Arnold v. Dow Chem. Co.*, 32 F. Supp. 2d 584, 589-90 (E.D.N.Y. 1999) (admitting the testimony of Dr. Ellenbecker when he relied on a similar evidentiary basis).

#### d. "Fit" of Dr. Ellenbecker's Report to the Facts

RTX argues that Dr. Ellenbecker cannot speak to the facts of this case because he did not rely on any studies looking specifically at asbestos-containing parts in the aviation context and ignored the 2007 study by Mlynarek and Van Orden which specifically studied jet engine overhaul work on Pratt & Whitney engines. Ellenbecker Precluson Mem. 11-17.

Dr. Ellenbecker's report cites three studies on asbestos exposure from gaskets. Ellenbecker Expert Report 28. *See* Larry R. Liukonen, Asbestos Exposure from Gasket Operations (1978); James R. Millette et al., *Releasability of Asbestos Fibers From Asbestos-Containing Gaskets*, 47 EIA Tech. J. 10 (1995); William E. Longo et al., *Fiber Release During the Removal of Asbestos-Containing Gaskets: A Work Practice Simulation*, 17 Appl. Occup. Environ. Hygiene 55 (2002).

RTX contends that Dr. Ellenbecker's reliance on these studies renders his testimony unreliable because he does not know if the gaskets in these studies are similar to, have the same useful life, or have the same adherence properties as the gaskets in Pratt & Whitney engines. Ellenbecker Precluson Mem. 13-14. There is no requirement, however, that an expert witness cite literature purporting to have studied the specific circumstances at issue in each case. My role is to determine whether the studies on which expert witnesses rely come from

"reliable scientific literature" and are "valid evidence on which to base an expert opinion," *Vedros v. Northrop Grumman Shipbuilding, Inc.*, Civ. Action No. 11-1198, 2015 WL 3916248, at *6 (E.D. La. June 25, 2015).

The studies Dr. Ellenbecker cites show that scraping and wire brushing asbestos-containing gaskets release respirable asbestos. Ellenbecker Expert Report 28. Hoff testifies to have performed the same activity with the gaskets in Pratt & Whitney's J57 and TF33 engines, and the parties agree that at least some of the gaskets in those engines contained asbestos. Dr. Ellenbecker is permitted to apply the results of a scientific study regarding scraping gaskets to the scraping of other similar gaskets, and so too apply the results of a scientific study regarding wire brushing gaskets to the same wire brushing of similar gaskets.

RTX is correct that Dr. Ellenbecker does not cite studies regarding the precise gaskets at issue and that the cited studies are in other contexts which may, in some appreciable way, differ from repairing jet engines. But to the extent that RTX "believes that these studies analyzed conditions that are factually distinguishable from those in which [Hoff] worked, [RTX] may highlight those differences on cross examination. . . . Nothing precludes [RTX] from challenging testimony actually provided by Ellenbecker at trial that unjustifiably analogizes between the literature and [Hoff's] experience." *Marcus v. Air & Liquid Sys. Corp.*, No. 22-cv-09058-HSG, 2024 WL 3171840, at *2 (N.D. Cal. June 24, 2024).

RTX's accusation that Dr. Ellenbecker relied on "cherry-picked" literature for his opinions because he ignored a "publicly available, peer-reviewed stud[y] regarding dust release from aviation engines," Ellenbecker Precl. Mem. 14-17, by Mlynarek and Van Orden which specifically studied jet engine overhaul work on Pratt & Whitney engines also misses the mark. "Cherry-picking occurs when an expert points to data that support a particular

position while ignoring or discrediting data that contradict it. It is *not* cherry-picking for an expert to prefer one study to another when he offers a coherent, scientifically plausible reason for the preference." *Rutledge*, 182 F. 4th at 191.

Dr. Ellenbecker was aware of the Mlynarek study and, as RTX admits, "provided his criticisms" of the study during his deposition. Ellenbecker Preclusion Mem. 16. In his deposition, Dr. Ellenbecker disagreed with the Mlynarek study's methodology, noting that the method used in the study "for actual quantifications is very imprecise, not a good method." Ellenbecker Dep., ECF No. 339-3, at 47. Dr. Ellenbecker's methodological criticisms of the Mlynarek study were that the "process of TEM [Transmission Electron Microscopy] analysis is not reliable . . . [because] the whole process of taking a sample and preparing it for analysis by TEM has multiple steps, all of which are subject to losses and inconsistencies" and that he has "never believed that you can use the indirect method" in the study to sample asbestos. *Id.* at 46. Dr. Ellenbecker also disagreed with the study's "illogical" reported average airborne concentration, its lack of recognition of the "risk of low-level exposures," and the fact that it conflated exposures from asbestos-containing and non-asbestos-containing parts. *Id.* at 46-49. Dr. Ellenbecker was not bound to rely on studies he found methodologically unsound, and choosing not to rely on such studies does not make Dr. Ellenbecker's testimony inadmissible.

**e. Dr. Ellenbecker's "Theory of Exposure"**

RTX lastly argues that Dr. Ellenbecker embraces a scientifically and legally invalid toxicological theory "that any amount of asbestos exposure has the capacity to cause cancer because there is supposedly 'no safe' level of exposure to asbestos." Ellenbecker Preclusion Mem. 17. "Such testimony," RTX continues, "cannot substitute for the legally required

evidence of causation—evidence of a substantial, beyond minimal, exposure and a medical link between that exposure and the disease contracted." *Id.* 22.

Before assessing the substance of Dr. Ellenbecker's proposed testimony, I note that RTX's "argument rests on a misperception of Dr. [Ellenbecker]'s testimony and its relationship to [Plaintiffs'] case. Dr. [Ellenbecker] is an industrial hygienist, not an epidemiologist or a pathologist." *Pritt*, 2022 WL 902684, at *8. Dr. Ellenbecker does not opine as to which of Hoff's asbestos exposures were a substantial factor in producing his mesothelioma—that expert testimony is reserved for Plaintiffs' pathologist, Dr. Staggs. Instead, Dr. Ellenbecker supports evidence of causation by establishing the "evidentiary link between [Hoff]'s own testimony regarding the tasks he performed and the equipment he encountered" and any testimony offered by Dr. Staggs that "the levels of asbestos exposure that [Hoff] encountered were a substantial factor in causing his mesothelioma." *Id.*

Substantively, RTX's criticism that Dr. Ellenbecker offers an invalid "each and every exposure" theory is both incorrect and beside the point. At his deposition, Dr. Ellenbecker explained that mathematical models of cancer risk hold that the "risk from one fiber, of course, is exceedingly small, but it can't be zero because if the risk for one fiber is zero, then the risk for a hundred fibers is zero, a thousand fibers is zero." Ellenbecker Dep., ECF No. 339-3, at 27-28. Relying on these models, Dr. Ellenbecker's report states that "every exposure increases the *risk* of developing lung cancer and mesothelioma." Ellenbecker Expert Report 25 (emphasis added). But the "each and every exposure" theory RTX attacks is about *cause* and not risk, as other courts have recognized. *Relyea v. Borg Warner Corp.*, No. 12-cv-3564 (DLC), 2015 WL 5567034, at *2 n.2 (S.D.N.Y. Sept. 22, 2015) (observing that an opinion that "any exposure above background *increases a person's risk* of developing mesothelioma" is

not "a rewording of the 'every exposure counts' theory, which maintains that any exposure above background *causes* mesothelioma, no matter the type or the dose") (citation modified). Dr. Ellenbecker does not assert that each fiber inhaled was a substantial factor in causing Hoff's mesothelioma. He does not offer an opinion on the cause of Hoff's mesothelioma at all.

As explained above, Dr. Ellenbecker is an industrial hygienist whose testimony goes to the production of respirable asbestos; he is not a pathologist identifying the etiology of Hoff's disease. Dr. Ellenbecker relies on Hoff's testimony about scraping gaskets and clouds of visible dust present during the removal of asbestos gaskets, and the "general published literature [that] indicates that a person removing and installing asbestos-containing gaskets produces elevated exposures to airborne asbestos" to make a modest conclusion regarding respirable asbestos: "[e]ach of Hoff's asbestos exposures from gaskets were elevated above the background asbestos concentration and contributed to Hoff's risk of developing mesothelioma." Ellenbecker Expert Report 28.

RTX seeks preclusion of Dr. Ellenbecker's testimony because of his purported opinions about causation. But Dr. Ellenbecker's testimony is about the amount of respirable asbestos above background and any associated risk, not medical or legal causation.

**f. Relevance and Prejudice Under Rule 403**

Rule 403 directs that expert testimony is to be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See Bustamante*, 100 F.4th at 430. RTX raises Rule 403 as a bar to Dr. Ellenbecker's testimony, arguing that Dr. Ellenbecker's lack of a factual foundation and cherry-picking of scientific studies will mislead and inflame a jury disproportionate to any probative value. Ellenbecker Preclusion Mem. 22-23. RTX offers essentially the same

argument under Rule 403 as it did under Rule 702. Having rejected RTX's contentions regarding the inadmissibility of Dr. Ellenbecker's testimony under Rule 702, I find that the same analysis applies under Rule 403 and deny RTX's motion to preclude Dr. Ellenbecker.

### 3. Motion to Preclude Dr. Staggs

RTX seeks to preclude the expert testimony of Dr. Staggs on the basis that Dr. Staggs's opinions are unreliable because he does not have a foundation from which to calculate the cumulative dose of Hoff's asbestos exposure from Pratt & Whitney engine components, and because he does not rely on the scientific literature most closely related to the specific context of this case.

RTX argues that there is no evidence in the record from which any scientist could calculate the cumulative dose of Hoff's asbestos exposure from Pratt & Whitney engine components. ECF No. 306, at 2. RTX accuses Dr. Staggs of "cherry-picking" his facts by citing data that supports his position and ignoring data that does not, *id.* at 4, and alleges that Dr. Staggs was not provided with critical information about Hoff's asbestos exposures prior to his time in the Air Force, *id.* at 13. Finally, RTX claims that, like Dr. Ellenbecker, Dr. Staggs subscribes to the scientifically-unsound "theory that virtually any amount of asbestos has the capacity to cause cancer because . . . there is 'no safe' level of exposure to asbestos." *Id.* at 8.

Plaintiffs reply that RTX's challenges to Dr. Staggs go to the weight, and not the admissibility, of Dr. Staggs's testimony, citing the liberal admissibility standard of Rule 702. ECF No. 342, at 12-16. Plaintiffs further contend that the factual bases for Dr. Staggs's opinions are presented clearly in his report, and that Dr. Staggs will rely on the reports and expert testimony of Plaintiffs' other experts as the foundation from which to build his expert testimony. *Id.* at 16.

I find that further inquiry into the expert testimony Dr. Staggs intends to offer is necessary to determine whether Dr. Staggs may testify that Hoff's exposure to respirable asbestos from Pratt & Whitney engines was a substantial factor in causing Hoff's mesothelioma. As such, I intend to hold a *Daubert* hearing with respect to Dr. Staggs's testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (noting that district courts possess "latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability"); *see also United States v. Yousef*, 327 F.3d 56, 148 (2d Cir. 2003) (citing *Kumho Tire*, 526 U.S. at 152) ("[A] district court is accorded broad discretion in terms of the procedures it adopts in conducting a *Daubert* hearing."), *overruled on other grounds as stated in United States v. Yousef*, 750 F.3d 254, 261 (2d Cir. 2014).

**4. RTX's Other Arguments on Causation**

RTX suggests that even if I admit the expert testimony of each of Drs. Ellenbecker and Staggs, Plaintiffs have failed to provide sufficient evidence from which a reasonable jury could find causation. In particular, RTX argues that Plaintiffs' experts provide insufficient evidence from which a fact-finder could reasonably conclude that work on aviation jet engines causes mesothelioma or lung cancer. In addition, according to RTX, the "vast majority" of the components of the Pratt & Whitney engines on which Hoff worked did not contain asbestos, and "most" engine-related work did not involve asbestos-containing components. Def.'s 56(a)1 St. ¶ 5. Moreover, RTX argues that Plaintiffs cannot establish which, if any, of the engine components that Hoff came into contact with actually contained asbestos. Def.'s Mem. 17-18.

To prove causation, Plaintiffs must establish that Pratt & Whitney's products were a substantial factor in causing Hoff's mesothelioma. *See Ruiz*, 315 Conn. at 329 ("The test for proximate cause is whether the defendant's conduct was a substantial factor in producing the plaintiff's injury.").

Resolving all disputed issues of fact and drawing all inferences in Plaintiffs' favor, a reasonable jury could find from Hoff's testimony, ECF Nos. 343-3, 343-4, the Asbestos Parts List, ECF No. 349, and Sumner's declaration and deposition testimony, ECF Nos. 316-4, 343-5, that Hoff handled asbestos-containing parts in J57 and TF33 engines over the course of 10 years. Hoff testified that he handled every part of the engines during the tear down process. Hoff Dep., ECF No. 343-4, at 17-19. A reasonable jury could conclude from Hoff's testimony that over the course of many years he frequently scraped gaskets from J57 and TF33 engines, which produced dust in the air. Indeed, Hoff testified that he almost always had to scrape the engine's gaskets to get them off. *Id.* at 20-22. The Asbestos Parts List establishes that the TF33 engine contained 28 kinds of asbestos-containing gaskets and that each variation of the J57 engines contained at least 22 kinds of asbestos-containing gaskets. ECF No. 349, at 2-4, 5-6. A reasonable jury could thus conclude that Hoff regularly scraped gaskets containing asbestos over the course of 10 years and when he did so, dust was created. A reasonable jury could further conclude from Dr. Ellenbecker's testimony that this dust from the gaskets contained respirable asbestos. The purpose of the *Daubert* hearing is for the Court to determine if Dr. Staggs will be permitted to opine that Hoff's exposure to respirable asbestos from Pratt & Whitney products was a substantial factor in producing Hoff's mesothelioma. If such testimony from Dr. Staggs is permitted, then the evidence in the record will be sufficient for Plaintiffs to defeat summary judgment and proceed to trial.

Accordingly, the Court denies RTX's Motion for Summary Judgment. Depending on the outcome of the *Daubert* hearing, the court may permit RTX to file a renewed summary judgment motion.

## IV. CONCLUSION

For the foregoing reasons, RTX's motion to preclude the expert testimony of Dr. Gerald Markowitz is DENIED without prejudice to renewal in advance of trial. RTX's motion to preclude the expert testimony of Theodore Cecchini is GRANTED in part and DENIED without prejudice in part. RTX's motion to preclude the expert testimony of Dr. Michael Ellenbecker is DENIED. RTX's motion for summary judgment is DENIED with respect to the government contractor defense and DENIED at this stage with respect to causation; the Court may permit RTX to renew its motion for summary judgment after the *Daubert* hearing regarding Dr. Staggs's testimony, depending on the outcome of that hearing.

**SO ORDERED.**

New Haven, Connecticut
September 23, 2026

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge